**Mary G. DALTON, et al., Plaintiffs,**

**v.**

**AMERICAN INVESTMENT COMPANY, a Delaware corporation, and Robert J. Brockmann, Earl R. Tweedie, Warren E. Van Norman, James D. Barnes, Erwin A. Stuebner, Norfleet H. Rand, Basil L. Kaufmann, Henry R. Barber, Albert J. O'Brien, M. Moss Alexander, Jr., Charles A. Specht, Francis Peter Cundill, Patrick M. Donelan, Alan G. Johnson, and Leucadia American Corp., a Delaware corporation, Defendants.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Jan. 21, 1985.
Decided: March 1, 1985.

Bruce M. Stargatt, and David C. McBride, of Young, Conaway, Stargatt & Taylor, Wilmington, and Paul Weil, of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiffs.

David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant American Inv. Co. and individual defendants.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, and Dennis J. Block, Sanford F. Remz, and Stephen A. Radin, of Weil, Gotshal & Manges, New York City, for defendant Leucadia American Corp.

BROWN, Chancellor.

This action is brought by certain preferred shareholders of American Investment Company, a Delaware corporation. The suit charges that the individual defendants, in their capacity as the board of directors of American Investment Company (hereafter "AIC"), breached the fiduciary duty owed by them to the plaintiffs during the course of a merger whereby AIC was merged into Leucadia American Corp., a wholly-owned subsidiary of Leucadia, Inc. ("Leucadia"). In that merger, the common shareholders of AIC were eliminated from their equity position in the corporation at a price of $13 per share. However, the preferred shareholders of AIC were not cashed out, but were left as preferred shareholders of the corporation surviving the merger. Plaintiffs contend that AIC's board looked only to the interests of the common shareholders in seeking a merger partner for AIC and, by so doing, unfairly froze the preferred shareholders into the post-merger AIC as completely controlled by Leucadia. Thus, the suit is unusual in that the plaintiff shareholders are complaining about being unfairly frozen in as shareholders as opposed to the more normal shareholder lament that they were unfairly cashed out.

The plaintiffs also contend that the benefit allegedly given to them in the merger—an increase in their preferred dividend percentage plus the creation of a sinking fund and a plan for the mandatory redemption of the preferred shares—was wrongfully accomplished since it was done without their approval. They say that this constituted a change which adversely affected their existing preference rights and that as a consequence they were entitled to vote as a class on the merger proposal. They say that the failure of the defendants to permit them to vote as a class rendered shareholder approval of the merger illegal and wrongfully forced them into their present predicament. Under either theory plaintiffs seek a recovery of money damages against the individual defendants as well as against Leucadia indirectly through its subsidiary, AIC.

This is a decision after trial, the plaintiffs' earlier application for a preliminary injunction to prevent the consummation of the merger having been denied. The background facts relevant to the decision are set forth hereafter.

I.

Plaintiffs own collectively some 220,000 shares of the total of some 280,000 shares of AIC's 5½% Cumulative Preference Stock, Series B. At the time of the events complained of, AIC had outstanding one other series of 5½% preferred stock consisting of some 81,000 shares. Immediately prior to the merger forming the basis for this litigation, AIC had slightly more than 5.5 million common shares outstanding. Thus, at the time of the merger the common stock comprised 94% of AIC's outstanding shares while the preferred stock constituted the remaining 6%.

The Series B preferred stock was issued in 1961 in consideration for AIC's purchase of two insurance companies owned by the plaintiffs or their predecessors in interest. This Series B preferred had a stated redemption and liquidation value of $25 per share. There was no provision for mandatory redemption of this preferred stock, but it carried with it an annual dividend rate of 5½% which was thus payable indefinitely.

The prevailing interest rate in 1961 was approximately 4½% and thus, at the time, an annual dividend of 5½% guaranteed indefinitely no doubt appeared to be a good bargain. These terms of the Series B preferred were negotiated as a part of the sale to AIC of the two insurance companies.

Aside from operating the insurance companies, AIC was in the business of consumer finance. In essence, it borrowed money wholesale in order to lend it at retail rates through a chain of offices scattered throughout the country. It is my impression that consumer finance was the primary business of AIC during the 1970's.

During the latter part of the 1970's, AIC found its fortunes gradually becoming a victim of the inflationary spiral that was overtaking the nation. In 1977 a group of AIC's common shareholders became dissatisfied with their lot and initiated a proxy fight to gain control of the corporation. Their goal was to maximize the value of their common shares and their ultimate solution apparently looked toward a sale of the company. This prospective proxy battle was eventually resolved with three members of the dissident group being placed on AIC's board of directors.

In the meantime the rising interest rates accompanying inflation began to put the squeeze on AIC. Its less than optimal bond rating hampered its efforts to obtain the long-term loans which it needed to conduct its consumer finance business and its earlier long-range financing procured in the previous days of lower interest rates was being gradually paid off with current funds. It became obvious that AIC needed either a merger or sale of assets to remain a viable company. As a result, following the 1977 resolution of the proxy contest, AIC retained the investment banking firm of Kidder, Peabody & Co., Inc. ("Kidder, Peabody") for the purpose of seeking out a prospective purchaser or merger partner.

Kidder, Peabody sent out many letters and pursued numerous merger candidates. Eventually, in 1978, Household Finance Corporation ("HFC") came forth with an offer to acquire all outstanding shares of AIC. The offer of HFC was $12 per share for the common stock and $25 per share for the two series of preferred stock. At the time Kidder, Peabody had valued AIC's common stock within a range of $9 to $11, and the $12 figure offered by HFC approximated the then book value of the common shares. At the $25 redemption and liquidation value, the price offered for the preferred shares represented their book value also. The preferred shares were trading for about $9 per share at the time.

This offer by HFC was approved as fair by Kidder, Peabody and was accepted by AIC's board. It was also approved overwhelmingly by AIC's shareholders, both common and preferred. However, the United States Department of Justice entered the picture and sought to prohibit the acquisition by HFC on antitrust grounds. Ultimately, the acquisition of AIC by HFC was enjoined by the federal courts and HFC's merger proposal was terminated.

Even before the appellate process concerning the HFC proposal had run its course, AIC's board authorized Kidder, Peabody to reactivate its efforts to find a merger partner for the company. This time, however, Kidder, Peabody was not given an exclusive right to do so, but rather the company also reserved the right to seek and entertain potential candidates on its own. In this endeavor the defendant Robert J. Brockmann, president of AIC and a member of its board, took the most active role.

It is significant to this decision to take note of three things in connection with this renewed effort to seek financial help for AIC, all of which necessarily permeated Brockmann's approach to the task. First, the HFC offer, being well known, had tended to establish a range for the cost of acquisition by other interested parties by indicating a price in the vicinity of $12 per share for the common stock and by further indicating a total acquisition price in the vicinity of $75 million. Secondly, the fact that HFC's offer had compared favorably

to the book value of AIC's shares provided Brockmann with the opportunity to suggest book value as the basis for any new offer, especially since the book value of AIC's common shares had increased during the interim even though its overall business outlook had continued to worsen. Thirdly, the offer of HFC to cash out the preferred shares at the $25 redemption and liquidation value had understandably come as somewhat of a surprise to the members of AIC's board. Since the preferred stock had been trading at less than $10 per share at the time, HFC's offer to cash out the preferred at $25 per share had been openly viewed by at least some of their number as a "Christmas present" for the preferred shareholders.

Accordingly, in his individual efforts to find a merger partner for AIC Brockmann adopted the approach of alluding to the book value of AIC's common shares as the basis on which an offer should be made. By that time, the book value of the common shares had increased to $13.50 per share. Brockmann was apparently careful to not ask for $13.50, or for any specific amount for the common shares even in his discussions with Leucadia, the eventual purchaser. He does concede, however, that by referring to the book value of AIC's stock he was attempting to establish a "floor" at which a potential purchaser would be inclined to commence its bidding. As he testified at trial:

"What I was trying to do [was] to establish a higher floor than the bid, than the offer that we had received from HFC. But I certainly didn't want to limit the imagination of any suitor on the top side, nor did I want to bid against myself. But I wanted to raise the floor, so that any thinking on their part would start at that level.

Q. And the level you mentioned was—

A. Was book value.

Q. And since they would not necessarily know what book value was, this was an AIC figure, did you tell them what it was?

A. It was published, but, yes, I would tell them that it was approximately 13.50 a share.

Q. So you would mention the 13.50 a share for common stock to prospective purchasers?

A. Sure, I would mention that as the comparable figure to what had appeared in the Household proposal for the common.

Q. Including among the people or interested people to whom you would mention that would be Leucadia?

A. I see no reason why I wouldn't have done that to Leucadia."

In February, 1980, Leucadia, a company also in the consumer finance business, submitted a written offer to AIC whereby it proposed to acquire all common shares of AIC for $13 per share. The proposal contained no offer for the preferred shares but rather it proposed to leave them in place. Later, presumably as a result of Brockmann's suggestion that something should be done for the holders of the preferred, Leucadia revised its proposal by offering to make available to AIC's preferred shareholders immediately following the merger a Leucadia debenture worth 40% of the face value of the preferred shares, with interest at 13%, which could be exchanged for the preferred shares. Still later, however, because of declining economic conditions, Leucadia withdrew its offer altogether.

In August, 1980, Leucadia reappeared. This time it offered $13 per share for all outstanding shares of AIC's common stock and offered further to increase the dividend rate on the preferred shares from 5½% to 7%. In addition, and again because of Brockmann's expression of concern for the preferred shareholders, Leucadia added a "sweetner" in the form of a sinking fund to redeem the preferred shares over a period of 20 years at the rate of 5% each year. Any such redemptions were to continue to be made by lot as provided by AIC's original preference designations, but subject,

however, to the added proviso that any market purchases or other acquisitions of preferred shares made during a given year could be credited against the annual 5% redemption requirement.

Kidder, Peabody opined that this offer was fair to AIC and its shareholders, stressing the fairness of the price to the common (AIC was trading for $11 per share on the day prior to the announcement of the approval of the merger in principle) and the safety that the proposal would provide to the rights of the preferred. The board of AIC accepted the offer and, when put to the vote of the shareholders, it was overwhelmingly approved by AIC's common shareholders and was approved unanimously by the holders of the other series of preferred stock. However, the holders of the Series B preferred, including the plaintiffs, voted some 170,000 of the 280,000 Series B shares against the proposal. Nonetheless, with all shares being accorded an equal vote, the plan of merger was adopted and AIC was merged into Leucadia American Corp., the wholly-owned subsidiary of Leucadia, with the name of the surviving corporation being changed to AIC. The former common shareholders of AIC were cashed out at $13 per share. Leucadia became the owner of all of AIC's common stock while the preferred shareholders were continued on as shareholders of AIC, albeit at the increased dividend rate and with the added redemption and sinking fund provisions.

Other relevant factors may be summarized as follows. On the same day that Leucadia submitted the offer that was ultimately accepted by AIC, another company, Dial Financial Corporation, still another company engaged in the consumer finance business, also submitted a merger proposal to AIC. The offer of Dial Financial Corporation (hereafter "Dial") was $13.50 per share for the common stock and nothing for the preferred other than the creation of a sinking fund for redemption purposes. The AIC board considered both offers but opted to take the Leucadia offer even

though it was 50¢ per share lower for the common stock because the board viewed Leucadia's offer to be better from the standpoint of the preferred shareholders and because it avoided potential antitrust problems since Dial was a direct competitor of AIC in certain market areas.

At the same time, Leucadia saw Dial's interest in AIC as a potential means to assist in financing its acquisition of AIC. As a result of three-way negotiations between the parties that followed, it was concluded that as a part of the overall merger transaction Dial would purchase $130 million in accounts receivable from AIC at a price of $120 million. This sale of assets by AIC was put to the vote of AIC's shareholders as part of the merger package and was approved as a part of the vote of the merger. As a consequence the AIC acquired by Leucadia through the merger came theoretically with enough cash to cover the expense of Leucadia's acquisition, the cost to Leucadia to acquire the common stock and to provide the immediate benefits to the preferred totalling some $72.2 million. Thus, viewed as the plaintiffs would have it, the proceeds from a sale or liquidation of assets by AIC provided the means to pay the common shareholders the value of their shares while the preferred shareholders were paid nothing.

Also, the defendant directors of AIC were fourteen in number, and all of them, to one degree or another, owned common stock in AIC. Collectively, their holdings comprised some 12% of AIC's outstanding common stock. However, only one of their number, the defendant Basil L. Kaufmann, owned preferred shares, and his were shares of the other series of preferred. At the same time Kaufmann's preferred holdings were substantial since he owned some 40,000 shares, or one-half of the other series of preferred. As a director, Kaufmann voted in favor of the Leucadia plan of merger.

Prior to giving its fairness opinion in 1980 approving the terms of the Leucadia merger proposal, Kidder, Peabody did a

study and concluded that the range of fair value for the AIC common at that time was from $11 to $12, including a premium. The fair inference from this is that in Kidder, Peabody's view the fair value of AIC's common shares in 1980 had not changed appreciably from its 1978 estimate of their value at the time of the HFC proposal.

Finally, it is conceded by the plaintiffs that as of the time of the merger the market value of their Series B preferred was something less than $9 per share and there was no trading market for such shares. It is also acknowledged that under the terms of the merger the holders of the preferred shares were entitled to appraisal rights so as to realize the value of their shares if they so chose. The plaintiffs did not seek such appraisal rights. Actually, some or all of their number sought an appraisal initially, but later withdrew their application, presumably in favor of this suit. Against this factual background, I turn to the contentions of the parties and the issues thus presented. Other relevant facts will be set forth as needed.

## II.

Addressing first the plaintiffs breach of fiduciary duty claims, it is their contention that the individual defendants, in their capacity as directors, owed a duty of fair dealing to all shareholders of AIC, both the common and the preferred, in negotiating and agreeing to any plan of merger. They say, however, that the defendant directors violated this duty to the extent that it was owed to the preferred shareholders once the HFC proposal had aborted. They charge that the defendants did so following the cancellation of the HFC offer by discreetly seeking to channel the whole of any prospective purchase price toward the payment for the common shares of AIC alone, and to the deliberate exclusion of the preferred shares.

Plaintiffs suggest that what Brockmann and the other directors did was note that HFC had offered to pay a total of $75.7 million to acquire AIC, broken down into components of $66.5 million for the common ($12 per share x roughly 5.5 million shares) and $9.2 million for the total of the two series of preferred ($25 per share x some 361,000 shares). They say that simple arithmetic shows that AIC's 1980 book value of $13.50 for the common shares multiplied by the 5.5 million common shares outstanding worked out to approximately $75 million. Since it was not necessary for a potential acquirer to cash out the preferred shareholders in order to gain control of the company, and since the AIC board viewed the offer of HFC to purchase the preferred shares at their redemption value of $25 per share as having been a potential "Christmas present" to the preferred shareholders anyway, plaintiffs charge that what Brockmann did, with the board's ultimate approval, was to suggest the book value of the common stock as the starting point for any merger offer so as to assure that the whole of any new offer would go totally to the owners of the common shares.

And, say plaintiffs, this is precisely what happened. They point out that Brockmann concedes that he responded to the initial interest of Leucadia, among others, by suggesting the book value of the common shares as the "floor" for any offer. They insinuate that by so doing Brockmann was attempting to tip-toe around the fact that he was actually soliciting an offer from Leucadia at $13.50 for the common stock and nothing for the preferred. Plaintiffs charge that as a direct result of what was actually a solicitation by Brockmann, Leucadia made the offer ultimately accepted by AIC's board of $13 for the common stock, with the nominal increase in the dividend rate and the creation of the sinking being thrown as a bone to the preferred shareholders solely to lend an arguable color of fairness to the overall transaction.

Plaintiffs say that this was wrong. They argue that even though they were minority preferred shareholders of AIC, they were nonetheless entitled to the protections of the fiduciary duty of fairness imposed upon

those who were in a position to guide the fortunes of the corporation. Compare, *Rothschild International Corporation v. Liggett Group, Inc.*, Del.Supr., 474 A.2d 133 (1984). They contend that the recent decision in *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701 (1984) makes it clear that they were owed a duty of fair dealing by AIC's board in its search for financial assistance for the company through the merger route. They say that our law is well established that where the real and only purpose of a merger is to promote the interests of one class of shareholders to the detriment, or at the expense, of another class of minority shareholders, the duty to deal fairly with all shareholders is violated and the merger transaction itself is rendered improper. *Porges v. Vadsco Sales Corporation*, Del.Ch., 32 A.2d 148 (1943); *Federal United Corporation v. Havender*, Del.Supr., 11 A.2d 331 (1940); *MacFarlane v. North American Cement Corporation*, Del.Ch., 157 A. 396 (1928).

Plaintiffs contend that the evidence here points to but one conclusion, namely, that the entire motivation of the AIC board commencing with the resolution of the proxy contest in 1977 was to extricate the common shareholders from a deteriorating situation at the maximum price possible, without equal regard for the best interests of the preferred shareholders. They say that the evidence further establishes that following the termination of the HFC proposal by the Federal courts the defendant directors deliberately sought, and finally agreed, to a new merger proposal which promoted the interests of the common shareholders at the expense of the minority shareholders. They say this is made clear by the uncontroverted fact that following the HFC offer neither Brockmann nor anyone else on behalf of AIC asked for any price whatever for the preferred shares in any discussions with prospective purchasers. They would have this fact measured against the equally indisputable fact that the defendant directors got $1 per share more for the common stock from Leucadia in 1980 than HFC offered for it in 1978

even though AIC's investment banker, Kidder Peabody, valued the common shares no higher in 1980 than it did in 1978 at the time of the HFC offer. Since AIC's fortunes were worse in 1980 than in 1978 and thus did not justify a higher price for the common shares even in Kidder, Peabody's view, plaintiffs suggest that the only plausible explanation for the Leucadia offer is that the defendant directors managed to engineer a switch to the common shares of the funds that a prospective purchaser, based upon the HFC offer, would have otherwise paid for the preferred.

Plaintiffs further argue that the defendant directors cannot hide behind the protection of the business judgment rule in so doing. They point to the fact that the defendant directors all owned common stock in the corporation—some of them in substantial amounts—and that consequently each of them stood to gain personally by what plaintiffs view as a solicitation by Brockmann which enticed Leucadia to load up its offer in favor of the common shareholders to the exclusion of the preferred shareholders. Plaintiffs say that the unfairness of the transaction to them is further accentuated and made ironic by the decision of the defendant directors to authorize AIC to sell the various accounts receivable to Dial at a $10 million discount in order to assure the financing needed by Leucadia to enable it to pay for the common shares, including those owned by the defendant directors, when normally it is the preferred shareholders who can expect to benefit from a liquidation of assets. The fact that the defendant directors had a financial interest in the outcome, plaintiffs argue, deprives them of the protection of the business judgment rule and casts upon them the burden to demonstrate the fairness of the transaction to the preferred shareholders which, plaintiffs contend, they have failed to do.

In sum, plaintiffs contend that the failure of the defendant directors to treat their interests evenhandedly with those of the common shareholders has damaged them

financially by leaving them as minority shareholders in a de-listed company and as the owners of an unmarketable preferred stock paying only a meager return when measured by present-day standards. They charge that the defendant directors knowingly took the action which has served to lock them in as preferred shareholders of AIC when, had they properly exercised the fiduciary duty of fair dealing owed to all shareholders, they could have extricated the plaintiffs at a fair price as well. For this alleged wrong, plaintiffs demand monetary damages.

In response, the defendants take the position that the arguments of the plaintiffs ignore the economic and legal realities of the situation. They point out first that the preference rights applicable to the Series B preferred were negotiated in 1961 as a result of arms-length bargaining surrounding the purchase of the two insurance companies by AIC. They suggest that if the original preferred shareholders failed to negotiate for redemption or other rights in the event of a merger or sale of substantial assets, they had nobody to blame but themselves. Defendants suggest that the Series B shareholders were probably unable to get such rights because they traded them off in order to get what was then a highly favorable 5½% dividend rate, guaranteed indefinitely. But, say the defendants, the fact that what had been a good deal in 1961 had turned sour by 1980—when interest rates were hovering near 20%—did not impose a fiduciary duty on AIC's board to get the Series B preferred shareholders out of that deal, or to negotiate a new deal for them.

In short, defendants argue that the rights of preferred shareholders are contract rights and that as against the rights of the common shareholders they are fixed by the contractual terms agreed upon when the class of preferred stock is created. *Wood v. Coastal States Gas Corp.*, Del. Supr., 401 A.2d 932 (1979); *Ellingwood v. Wolf's Head Oil Refining Co.*, Del.Supr., 38 A.2d 743 (1944). Since the preferred

shareholders had no contractual right to be bought out as part of the acquisition of AIC by Leucadia—either at par value or at any other price—defendants argue that the board of AIC had no fiduciary duty to bargain on their behalf in an effort to obtain a cash-out deal for them also.

Second, defendants argue that the record is completely devoid of any evidence that they actually solicited an offer from Leucadia for the common shares alone. In fact, they take the position that Leucadia's offer was unsolicited. They say that all that Brockmann did with regard to Leucadia was the same that he did with all other interested parties, namely, attempt to establish a "floor" for any offer by referring to the fact that HFC's offer had been for the equivalent of book value. They say that this did not amount to asking Leucadia to allocate the whole of any offering price to the common shares and to leave the preferred shares in place. They say that Leucadia made its own decision for its own reasons in deciding to offer $13 per share for the common stock alone, as the evidence indicates. In this respect the defendants view Leucadia's offer as having been unsolicited, and thus they contend that they did not breach any fiduciary duty owed to the preferred shareholders, even assuming that one existed in this context, by soliciting an offer for the common shares to the exclusion of the preferred shares as charged by the plaintiffs.

Thirdly, defendants point out that the real reason for Leucadia's offer for the common shares only was the fact that as to Leucadia the preferred shares constituted "cheap debt", as Leucadia well appreciated. They point out that the cost of borrowing $9 million at an approximate 20% rate of interest in order to pay the preferred shareholders their liquidation value of $25 per share so as to eliminate a debt of the corporation carrying a 5½% dividend rate would have made little economic sense.

Defendants say that they have no idea as to why HFC made the surprising offer in 1978 to buy out the preferred shares at

face value. They speculate that perhaps it was due to the fact that the average prime interest rate for 1978 was 9.07% coupled with the fact that corporate dividends can only be paid after corporate taxes are paid. For a profit-making corporation, like HFC, the 5½% dividend rate must effectively be doubled in order to obtain the real, after-tax cost. Thus, arguably, the cost to HFC of a 5½% dividend (11%) would have been greater than the 1978 average prime rate of 9.07%, and thus it might have represented sound economics for HFC to have purchased the preferred shares, even at their liquidation value. Regardless of this, however, defendants point out that Leucadia was in the position in 1980 of having a tax-loss carry forward, and thus it was not paying any taxes. Consequently, the after-tax cost to Leucadia of a 5½% dividend was 5½%, which was substantially below the 20% peak in the prime interest rate in 1980. Accordingly, to leave the preferred shares in place permitted Leucadia to purchase what for it was "cheap debt" as a part of the acquisition of AIC, and defendants contend that the evidence shows that Leucadia never considered doing otherwise.

Finally, defendants point out that Leucadia's view of the preferred shares as "cheap debt", and the fact that Leucadia was well aware that it could accomplish its goal of acquiring AIC without the need to purchase the preferred shares, left Brockmann and the other members of AIC's board with absolutely no leverage with which to negotiate a pay-out for the preferred. Moreover, had they attempted to do so once Leucadia made its offer, two consequences were possible—both being fraught with danger insofar as AIC's board was concerned.

First, if AIC's board had attempted to persuade Leucadia to reduce its $13 per share for the common by some portion in order that the difference might be used to cash out the preferred shareholders, such conduct could have been viewed as a breach of the fiduciary duty of fair dealing owed to the common shareholders and subjected the board members to suit for this reason. Alternatively, such an effort by the AIC board might have caused Leucadia to believe that it could acquire the common shares for less than $13 per share, in which event Leucadia might have reduced its offer for the common and still offered nothing for the preferred—again subjecting the board to potential suit by the common shareholders. And, of course, there was always the possibility that if AIC's board rejected the proposal for its failure to include a price for the preferred shares, Leucadia could have backed off and gone the tender offer route for the common shares so as to acquire control in that manner and bring about a merger under its own terms at some later date.

Thus, the defendants contend that on the evidence there is nothing to establish that AIC's board breached any fiduciary duty—particularly a duty of fair dealing—owed to AIC's preferred shareholders. To the contrary, given the absence of any bargaining power that they had on behalf of the preferred, defendants contend that the AIC board members did well to get the preferred dividend rate increased from 5½% to 7% (a 27.3% increase) and to secure a means for the gradual redemption of the shares at face value where none existed before. They contend that the actions of the AIC board are protected by the business judgment rule. They note further that the defendant Kaufmann, the only preferred shareholder on the board, thought the merger plan to be fair to all shareholders and voted in favor of it. For these reasons defendants ask that judgment be entered in their favor.

### III.

Having considered the foregoing arguments in light of the evidence, I am satisfied that the answer to the plaintiffs' charges of breach of fiduciary duty lies somewhere between the legal positions advocated by the parties, and that it turns on the factual determination of whether or not Leucadia's offer was made in response to a

solicitation by Brockmann and the other directors defendants. I find on the evidence that it was not, and accordingly I rule in favor of the defendants on this point.

As framed, the issue appears to be a troublesome one on the surface. However, it can be placed in perspective if certain factors are first weeded out. To begin with, I have no doubt that Brockmann and the AIC board were attempting to invite an offer of $13.50 for the common stock while at the same time they were seeking nothing specific for the preferred shares. One could scarcely reach any other conclusion. I am convinced also that they well suspicioned that if a third party offered anything near that amount for the common stock there would be little, if anything, offered for the preferred. I think that the inference to be drawn from the evidence on this point clearly preponderates in favor of the plaintiffs.

I think also that the Hobson's choice defense raised by the defendant directors— i.e., that once Leucadia's offer came in at $13 for the common stock they could not have attempted to divert part of it to the preferred shareholders without running the risk of breaching the fiduciary duty owed by them to the common shareholders— misses the point. A close examination of the plaintiffs' position reveals that they are not complaining about the conduct of the defendant directors once the Leucadia offer was on the table. Rather, they are charging that but for the misconduct of the defendant directors, i.e., inviting an offer for the common shares alone in deliberate disregard of the rights of the preferred, Leucadia's offer would not have gotten on the table in the form that it did in the first place.

This latter distinction is made evident by the plaintiffs' concession in post-trial argument that if Leucadia's offer for the common stock had been unsolicited, and if Leucadia had been unwilling to pay anything for the preference shares notwithstanding the price that it had to pay for the common,

then there would have been little that the AIC board could have done for the preferred shareholders. I think that the evidence indicates that this is close to the situation as it existed.

Given that Brockmann's approach of alluding to the book value of the common shares can, in the context of matters, be reasonably interpreted as a solicitation for an offer for the common shares only without a corresponding offer for the preferred, what the plaintiffs proceed to do in their argument is to then assume that the Leucadia offer was made in response to that solicitation and as a direct result of it. Because only if that were so can the plaintiffs establish that the predicament in which they now find themselves was caused by the conduct of the AIC directors, and only then would we reach the legal question of whether or not it was a breach of the fiduciary duty owed by the directors to the preferred shareholders for them to have engaged in such conduct.

I find that we do not have to reach this legal question because the inference of causal connection which the plaintiffs attempt to draw from the sequence of events as they happened is adequately rebutted by the direct evidence offered by Leucadia. When the trimmings of precedent and fiduciary duty are brushed aside, plaintiffs' argument, reduced to its simplest terms, is (1) that between the HFC proposal in 1978 and the Leucadia merger in 1980 the price per share for the common stock was increased from $12 to $13 per share while the preferred shareholders went from $25 per share to no cash consideration whatever, and (2) that during the interval between the two events Brockmann and the AIC board were soliciting offers at book value, or $13.50, for the common shares while seeking nothing for the preferred. From these two premises plaintiffs proceed to the conclusion that the difference between the HFC and Leucadia proposals was necessarily a direct result of the efforts by the AIC board to increase the cash consideration from the common stock with knowledge

that such an increase would be at the expense of the preferred shares. Having thus bridged the gap to arrive at this factual conclusion, plaintiffs then plug it into the legal principle which holds that it is improper for those in a fiduciary position to utilize the merger process solely to promote the interests of one class of shareholders to the detriment, and at the expense, of the members of a minority class of shareholders. Thus plaintiffs reach their final position that they have been injured monetarily by the failure of the defendant directors to adhere to their fiduciary duty to deal fairly with all shareholders in a merger context.

The weakness in the plaintiffs' argument, as I see it, is making the factual assumption that because Brockmann's solicitation of an offer from Leucadia and the subsequent Leucadia offer crossed each other, the latter must have been a direct result of the former. It is the "but for" assumption. It is an argument that "but for" Brockmann's solicitation of an offer for the common stock alone with nothing sought for the preferred, Leucadia would likely have followed HFC's lead and proposed a buy-out of both classes of stock at a price of something less than $13 per share for the common and at a price either equating or approaching the liquidation value of the preferred. In addition to being speculative, such a proposition does not comport with the evidence.

The evidence indicates that the Leucadia offer was formulated and put forth by two of Leucadia's principle officers and shareholders, Ian M. Cumming and Joseph S. Steinberg. Steinberg in particular helped to structure the offer price. He has a background and experience in investment banking. The deposition testimony of Steinberg was admitted in evidence. It reveals that when asked how he arrived at the $13 per share figure which resulted in the total $72.2 million offer, Steinberg responded as follows:

"I reviewed the published financial data of AIC. I looked at the trading activity of the AIC stock. I looked up in the newspaper what other consumer finance companies were selling for. And I added to that my intuitive opinion of what it was worth. And I put that all into a hat and shook it up, and out came the price which we were eventually willing to pay after negotiating an overall deal with AIC."

As to Leucadia's reasons for not offering to cash out the preferred, the following colloquy appears:

"Q As the transaction ultimately took shape, a determination was made by Leucadia not to offer to cash out the preference stock of AIC in the merger transaction; is that right?

A Yes.

Q Why?

A We regarded the preference stock as the equivalent of debt and an important consideration for us in being interested in American Investment was being able to leave in place all of the various long-term debt agreements of AIC. And we were advised by our attorneys that none of the provisions of any of the debt agreements or the preference stock agreement required that the stock be redeemed or debts paid off, and we did not see that it was to our advantage to prepay any debt or redeem any preference stock and were not interested in doing so and probably would not have been interested in the transaction at all if we have been required to prepay debt or redeem preference stock."

Concerning the activities of Brockmann on behalf of the preferred shareholders, Steinberg's testimony was as follows:

"Q From American Investment's side, did they at any time insist that you make an offer for the preference stock even though your lawyers told you you weren't legally obliged to do so?

A Bob Brockmann at some point told Ian [Cumming] and told me that the written terms of the preference stock did not require it to be redeemed as part of a merger transaction but that the board of directors of AIC felt an obligation to the

preference stockholders to attempt through negotiation to improve their position, and he requested, Brockmann requested, that Leucadia improve the terms of the preference stock somewhat, and we thought about his request, and in order to get a deal done that would be approved by both boards of directors, we offered and they accepted a modification of the preference stock whereby the interest rate of the dividend went up, I believe, to seven percent and a sinking fund was established for the preference stock."

Finally, when asked to compare Leucadia's offer with the earlier HFC offer, Steinberg responded as follows:

"A Well, Household, I believe, was offering twelve dollars, and our offer was for thirteen on the common, and Household was prepared to redeem the preference stock at slightly over $25, and we were offering to increase the interest rate from 5½ to 7 and to establish a sinking fund where there was none before.

Q Did you ever give consideration to offering twelve dollars for the common stock and redeeming the preference stock?

A No."

Overall, Steinberg's testimony indicates that Leucadia had its own economic justification for not cashing out the preferred shareholders, that Leucadia was advised by its attorneys that it was not legally necessary that the preferred shares be bought out, and that Leucadia reached its decision to offer to purchase the common shares only for its own reasons and not because of anything said by Brockmann or anyone else on behalf of AIC.

■ Accordingly, I find on the evidence that Leucadia's offer in the form in which it was put forth was not made in direct response to a veiled solicitation by Brockmann. Rather, I find that the Leucadia offer was made by knowledgeable and experienced businessmen who chose to take advantage of an existing situation of which

they were well aware for business reasons peculiar to the interests of their company. Thus, I cannot find that the terms of the merger which left the plaintiffs as continuing preferred shareholders of AIC were brought about as a result of any breach of fiduciary duty on the part of the defendant directors of AIC, even assuming without deciding that the conduct of Brockmann and the AIC board in seeking a merger partner in the manner they did would have constituted a breach of fiduciary duty owed to AIC's preferred shareholders.

### IV.

Plaintiffs' alternative theory for relief is purely a legal one. As noted previously, it is their claim that the Series B preferred had a right to vote as a class on the merger proposal because the sinking fund and the redemption rights to be given to the preferred shareholders under the terms of the merger agreement adversely affected the existing preference rights of their shares. The argument proceeds as follows.

Prior to the merger, AIC's certificate of incorporation provided that any particular class of preference shares could be redeemed at any time and at the prices specified in the certificate of designations for the class, but subject to the provision, however, that in the event of a redemption of less than all such shares, the shares to be redeemed had to be chosen by lot in a fair and impartial manner.

As part of the merger agreement between Leucadia and AIC it was proposed that AIC's certificate of incorporation, and particularly the certificate of designations for the preferred stock, be amended to increase the dividend rate and to provide for the sinking fund and mandatory redemption requirements over the 20-year period. It was also proposed by the same amendment that direct purchases or other acquisitions of preferred shares by AIC—which purchases or acquisitions were not required to be by lot or at the stated redemption price—could be "applied as a

credit" against AIC's obligation to redeem shares pursuant to the newly created sinking fund requirement.

The statute governing such a proposed amendment of stock preferences granted by a certificate of incorporation is found at 8 *Del.C.* § 242(b)(2). In relevant part the statute provides as follows:

> "The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would ... alter or change the powers, preferences or special rights of the shares of such class so as to affect them adversely."

Plaintiffs contend that the requirement of redemption by lot as it existed prior to the merger was a special right given to the Series B preferred and that the proposed amendment to their Series B stock preferences effectively altered that right to their detriment. Because of this belief, it is their position that they were entitled by § 242(b)(2) to vote as a class on the proposed merger and that the denial to them of such a class vote tainted the legality of the merger itself. Recognizing that it is not feasible to now undo the merger, plaintiffs seek monetary damages for the wrong which they feel was thus inflicted upon them and which, in their view, contributed directly to their presently undesirable, locked-in position.

The key to this, of course, is whether or not the amendment as proposed was one which altered the plaintiffs' existing preference rights so as to adversely affect them. Plaintiffs say that it did so because, in effect, it permitted AIC thereafter to redeem Series B shares without doing so by lot. They say that this is made evident by the fact that the amendment permitted AIC to purchase shares directly from Series B shareholders who were willing to sell and to credit such purchases against its obligation to redeem 5% of the Series B preferred each year at the stated redemption value. Thus, plaintiffs say that the intended purpose of the amendment was to empower AIC to make selected redemptions from individual shareholders, thereby depriving the plaintiffs of their previously existing opportunity to have shares belonging to them redeemed based upon the luck of the draw.

Moreover, plaintiffs argue that the amendment further deleted their previously existing preference rights by enabling AIC to fulfill its redemption obligations through negotiated repurchases from Series B shareholders who would find themselves unhappily locked into a bad investment, and to do so under conditions which would be very favorable to AIC. They say that the sinking fund has given rise to a form of "reverse auction" by means of which the Series B shareholders are forced to bid against themselves in an effort to get something for their stock now as opposed to waiting out a period of years at a 7% dividend rate on the chance that at some point a redemption of their shares might possibly occur. They suggest that this constituted a coercive plan designed to enable AIC to purchase the preferred shares cheaply and to thus get credit for redemptions at prices substantially below the stated redemption values. Thus, they argue that the amendment has further altered their previously existing preference rights by providing a means for AIC to redeem their shares at less than the stated redemption price.

■ I find, however, that I am not persuaded by plaintiffs' argument on this issue. The original requirement that any redemption of less than all shares of the Series B stock be accomplished by lot was not changed by the merger. That requirement still remains in the certificate of incorporation. Thus, any redemptions as such which are made necessary in order to meet the annual 5% mandate of the sinking fund must still be done by lot.

Moreover, the new provision which gives AIC the right to credit purchases of preferred shares against the annual redemption requirement of the sinking fund did

not give AIC any new powers as against the Series B shareholders since it is undisputed that even before the merger AIC had the statutory right to purchase shares from its shareholders in voluntary transactions at negotiated prices. See 8 *Del.C.* § 160(a). Such repurchases then would have served to reduce the shares remaining for possible redemption just as the repurchases under the amendment would do now. This illustrates, I think, the point to be made.

Prior to the merger AIC was not required to redeem any of the preferred shares at any time. If a preferred shareholder desired to sell his shares on the market for their trading value, AIC could buy them and thus reduce the preferred shares remaining. Presumably, it could also have acquired shares at negotiated prices below the stated redemption value. Its only obligation was to redeem the preferred shares by lot in the event that it elected to redeem some, but not all, shares of either of its two classes of preferred.

Following the merger and the consequent amendment of the certificate of incorporation, the only change that was made was that AIC became obligated to redeem up to 5% of the Series B preferred in each year provided that it did not purchase that amount or more through negotiated or market purchases. To the extent that it might purchase or otherwise acquire some, but not all, of the annual 5% requirement, it became obligated to redeem the difference between the two at the stated redemption value. In either event the redemptions had to be made by lot just as before.

Thus, as I see it, what the amendment did was impose upon AIC a new obligation in the form of a conditional requirement to redeem up to a certain amount of preferred shares each year when previously it was under no obligation to redeem any shares at all. Aside from this, the rules of the game were not changed.

I think that the discontent of the plaintiffs stems from the practical outgrowth of this conditional redemption requirement. Because there may be sufficient Series B shareholders each year who opt to sell their shares to AIC at prices substantially below redemption value in order to get out of the economic bind in which they find themselves, the result may be, at least for a period of years, that AIC will always be able to purchase enough shares on an annual basis to avoid the need to redeem any Series B shares at the redemption price. This will effectively deprive the plaintiffs of any opportunity to have shares owned by them redeemed by lot at the stated redemption value, at least for a period of time. This dilemma in which the Series B shareholders find themselves is made worse by the fact that the owners of the other class of preferred shares, which is basically controlled by the defendant Kaufmann and one who was his former business associate, have agreed not to sell to AIC voluntarily, thus forcing the corporation to redeem 5% of their shares each year at their full redemption value.

At the same time, the fact that the plaintiffs had no right to have their Series B redeemed prior to the merger would seem to indicate that they are no worse off now following the merger simply because AIC, through private purchases, can possibly avoid redeeming Series B shares in any given year even though it now has a conditional obligation under the newly created sinking fund provision to do so.

It seems to me that the real basis for the plaintiffs discontent is that insofar as the merger with Leucadia may have been touted as providing an immediate redemption benefit to the owners of the Series B preferred, it was, and has proved to be, illusory. This may be true, and perhaps it was designed by Leucadia to work in this fashion from the outset. I would not be at all surprised to find that it was. However, to say that the promise of any immediate redemption benefit was illusory is not to say that the sinking fund and mandatory redemption amendments to the certificate of incorporation altered the prior redemption preferences of the Series B preferred shares so as to affect them adversely, at least not in the sense of depriving the Series B shareholders of redemption rights that they possessed before. For this rea-

son, I conclude that the plaintiffs have also failed to prove a claim on which relief can be granted on their theory that the Series B shareholders were entitled to vote on the approval of the merger as a class.

### V.

Because of the determinations made herein, it becomes unnecessary to deal with the plaintiffs' contentions concerning damages. I do take note, however, that the appraisal remedy was available to them had they desired to get out of AIC at the time of the merger in return for the eventual payment of the fair value of their shares as determined by the Court. I note further that they apparently still retain the preferred shares which form the basis for their damage claims. To me, this translates their position into one in which they are seeking to recover a monetary award in an amount in excess of the fair value of their shares as determined as of the date of the merger while continuing on as owners of those same shares and the redemption rights applicable to them. However, there is no need to pursue the matter further.

For the reasons given, judgment will be entered in favor of the defendants. A form of order may be submitted.