WARNER COMMUNICATIONS INC., a Delaware Corporation, Time Warner Inc., a Delaware Corporation (formerly Time Incorporated), and TW Sub Inc., a Delaware Corporation, Plaintiffs–Counterclaim Defendants,

v.

CHRIS–CRAFT INDUSTRIES, INC., a Delaware Corporation, and BHC, Inc., a Delaware Corporation, Defendants–Counterclaim Plaintiffs.

Civil Action No. 10965.

Court of Chancery of Delaware, New Castle County.

Date Submitted: Aug. 28, 1989.
Date Decided: Sept. 7, 1989.

Charles F. Richards, Jr., William J. Wade, Thomas A. Beck, Gregory V. Varallo, Donald A. Bussard, Daniel A. Dreisbach, and Michael J. Feinstein of Richards, Layton & Finger, Wilmington, and Eric M. Roth, and Scott A. Edelman of Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff and counterclaim defendant Warner Communications Inc.

Martin P. Tully, Thomas Reed Hunt, Jr., and Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Lisa D. Haas and Thomas P. Ogden of Davis Polk & Wardwell, New York City, for plaintiffs and counterclaim defendants Time Warner Inc. and TW Sub Inc.

Charles S. Crompton, Jr., Donald J. Wolfe, Jr., and Arthur L. Dent of Potter Anderson & Corroon, Wilmington, and Peter M. Fishbein, Scott M. Berman, Karen E. Katzman, and Jane W. Parver of Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants and counterclaim plaintiffs Chris–Craft Industries, Inc. and BHC, Inc.

## OPINION

ALLEN, Chancellor.

Pending is a motion for judgment on the pleadings. Plaintiffs seek a determination that the related holders of Warner Communications Inc.'s Series B Variable Rate Cumulative Convertible Preferred stock ("Series B Preferred") are not entitled to a class vote upon a proposed merger among Warner, its controlling shareholder Time Incorporated (now renamed Time Warner Inc.) and TW Sub Inc., a wholly owned subsidiary of Time Warner.

Plaintiffs in this declaratory judgment action are the parties proposing the merger —Warner, Time and TW Sub, all of which are Delaware corporations. Defendants are two corporations, Chris–Craft Industries, Inc. and its controlled subsidiary, BHC, Inc., which together with its wholly owned subsidiary, is the holder of the Series B Preferred stock. For purposes of this opinion, plaintiffs generally will be referred to as Warner; Time Warner, for purposes of clarity, will be referred to as Time and the holders of the Series B Preferred will be referred to as BHC.

The merger in question is the proposed "back end" of a transaction, the first stage of which was a public tender offer for 51% of Warner's common stock for cash that closed on July 24, 1989. In that merger, the Series B Preferred stock would be cancelled and BHC as the holder of it would receive a new senior security, Time Series BB Convertible Preferred. For purposes of this motion (but for those purposes only), plaintiffs have stipulated that that substitution would adversely affect defendants.

For the reasons that follow, I conclude that BHC has no right under the Warner

certificate of incorporation to a class vote on the proposed merger. In brief, I reach this conclusion upon consideration of the pertinent provisions of the Series B Preferred stock's certificate of designation read in the context of the entire document and in the context of the established corporation law. This consideration compels the conclusion that the drafters of this document did not intend the holder of the Series B Preferred to possess a veto over every merger in which its interest would be adversely affected. Such a right was conferred expressly but only in narrowly defined circumstances concededly not present here. Absent such circumstances, I conclude that there is no right in the holders of the Series B Preferred to a class vote on a merger. The statement of the reasoning that leads to this conclusion entails a separate treatment of each of the two certificate of designation provisions—Section 3.3(i) and Section 3.4(i)—upon which BHC predicates its contrary assertion.

The facts are as admitted in the Answer and the Reply to Counterclaim. Neither party contends that there are material facts in dispute at this stage (on the assumption that the Series B Preferred shareholders will be adversely affected by the merger) and both assert that the legal question presented is appropriately addressed on the pleadings as they now exist.

## I.

### The Series B Preferred stock

The Series B Preferred was issued pursuant to an Exchange Agreement dated as of December 29, 1983 among Warner, Chris–Craft and BHC. Under that Exchange Agreement, Warner obtained BHC preferred stock convertible into 42.5% of BHC's outstanding common stock. BHC obtained the entire issue, 15,200,000 shares, of Warner's Series B Preferred stock.

As provided in the certificate of designation creating the Series B Preferred, each share of that stock is entitled to a quarterly dividend equal to the greater of (a) $0.125 or (b) 200% of the regular quarterly dividend, if any, payable on a share of Warner common stock.[1] Each share is convertible into common stock in accordance with a complex formula, and each carries the same voting rights as the common stock, except in the event that a dividend is in default. In that event, the Series B Preferred stock "voting as a class" elects three directors. Generally, however:

> Except as otherwise by the Certificate of Incorporation or by law provided, the shares of Series B Stock and the shares of Common Stock ... shall be voted together as one class.

Certificate of Designation, Section 3.1.

Two provisions do otherwise provide, and it is they that provide the ground upon which the parties' ongoing battle[2] is now fought. Section 3.3 of the certificate of designation creates a right in the holders of the Series B Preferred to participate with other holders of Warner preferred in a class vote under certain circumstances. Section 3.4(i) of the certificate creates a right in the holders of Series B Preferred stock alone to a series vote in certain circumstances. Section 3.3 provides in pertinent part as follows:

> So long as any shares of Series B Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by law, (i) the affirmative vote or written consent of the holders of at least two-thirds of the total number of the then outstanding shares of Series B Stock and of any other series of Preferred Stock having the right to vote as a class on such matter, voting as a class, shall be necessary to alter or change any rights, preferences or limitations of the Preferred Stock so as to affect the holders of all of such shares adversely....

---

1. A two-for-one stock split in 1986 resulted in a proportionate adjustment of the original formula, which was the greater of (a) $0.125 or (b) 100% of the regular quarterly dividend, if any, on common stock.

2. These parties have not had harmonious relations. *See, e.g., Warner Communications Inc., et al. v. Chris–Craft Industries, Inc., et al.,* Del.Ch., C.A. No. 10817, 1989 WL 51662 (May 15, 1989).

In pertinent part, Section 3.4 provides as follows:

> So long as any shares of Series B Stock shall be outstanding and unless the consent or approval of a greater number of shares shall then be required by law, without first obtaining the consent or approval of the holders of at least two-thirds of the number of shares of the Series B Stock at the time outstanding, given in person or by proxy either in writing or at a meeting at which the holders of such shares shall be entitled to vote separately as a class, the Corporation shall not (i) amend, alter or repeal any of the provisions of the Certificate of Incorporation or By-laws of the Corporation so as to affect adversely any of the preferences, rights, powers or privileges of the Series B Stock or the holders thereof....

### The proposed Warner–Time merger

Time and Warner have executed a merger agreement, which was amended and restated as of June 16, 1989. That agreement contemplates a two-step transaction by which Time would acquire all of the outstanding stock of Warner. The first step was completed on July 24, 1989 when Time accepted for purchase 100 million shares of Warner common stock, representing approximately 50% of Warner's common stock, at $70 per share in cash.

Under the amended merger agreement, the tender offer is to be followed by a merger in which TW Sub will be merged into Warner which will survive as a wholly owned subsidiary of Time. The Warner common stock, other than that held by Time, will be converted into securities, cash or other property.[3] The Warner Series B Preferred is to be converted into Time Series BB Preferred stock. The rights and preferences of the Time Series BB Preferred are set forth in a proposed form of certificate of designation.

Since the parties have stipulated for the purposes of this motion that the holders of

Warner Series B Preferred will be adversely affected by the back-end merger, it is unnecessary to summarize the terms of the Time BB Preferred.

The amended merger agreement provides that shares of Warner common stock and Warner Series B Preferred stock, the holders of which comply with all provisions of the General Corporation Law concerning appraisal rights, will not be converted in the back-end merger.

### II.

A party is entitled to judgment on the pleadings when, accepting the well pleaded facts admitted in the Answer to be true, there is no material fact in dispute and the moving party is entitled to judgment under the law. 5 Wright & Miller, Federal Practice and Procedure § 1386 at p. 692. On such a motion, the nonmoving party is entitled to the benefit of any inferences that may fairly be drawn from the nonmoving party's pleading. *Harman v. Masoneilan Intern., Inc.*, Del.Supr., 442 A.2d 487 (1982); *Du Pont v. Du Pont*, Del.Supr., 90 A.2d 467 (1952). The motion should not be granted unless it appears to a reasonable certainty that under no set of facts that could be proven under the allegations of the Answer would plaintiffs' claim be defeated. In this instance, however, both parties agree that no material facts are in dispute and that the matter is in a posture for a ruling upon the legal questions presented.

### III.

BHC contends that it is entitled to a class vote on the proposed merger under two distinct provisions of Warner's certificate of incorporation. First, defendants argue that Section 3.3(i) of the certificate of designation gives BHC the right to a class vote. It contends that Section 3.3(i) protects against *any corporate action* that alters or changes "any rights or preferences" of the preferred stock so as to ad-

---

**3.** The pleadings do not disclose, nor is it pertinent for present purposes, just what form that consideration will take.

versely affect the preferred shareholders. The proposed merger, it says, will alter the rights of the Series B Preferred (and on this motion presumptively in an adverse way) by substituting a new security—Time BB Preferred—for the Series B Preferred. Thus, it concludes, Section 3.3(i) requires that BHC be afforded the opportunity to vote on that merger separately.

Second, defendants argue that Section 3.4(i) of the certificate of designation entitles BHC to a vote on the back-end merger because the Warner certificate of incorporation will admittedly be amended by the merger and necessarily so under Section 243 of the Delaware corporation law. That amendment they say—eliminating the provisions authorizing the Series B Preferred—will adversely affect BHC and will trigger the right to a class vote under Section 3.4(i).

Finally, defendants contend that the fact that Section 3.4(iii) (quoted below at pp. 22–23) specifically addresses mergers does not preclude other sections, such as Sections 3.3(i) and 3.4(i), from applying to mergers.

Warner answers that it is Section 3.4(iii) of the certificate of designation that is the dispositive provision relating to mergers. That section requires supermajority approval of a merger by the holders of Series B Preferred if in the merger they receive equity securities that are not the highest ranked equity securities of the surviving, resulting or acquiring corporation. Warner points out that under the merger the holders of Series B Preferred stock will receive Time Series BB Preferred stock which will be the senior equity security of Time. Thus, plaintiffs contend that Section 3.4(iii) is the pertinent provision and it

grants no right to vote on the back-end merger to the Series B Preferred shareholders.

As to BHC's claim that Sections 3.3(i) and 3.4(i) do grant it the right to a class vote in these circumstances, Warner contends first that Section 3.3(i) was intended to protect only rights and preferences of the entire class of preferred stock, not rights and preferences granted to one or more particular series of preferred stock. The only right or preference *necessarily* shared by every series of preferred stock, plaintiffs continue, is the right granted in Article Fourth (C), clause (2) of Warner's certificate of incorporation to share ratably in dividends and asset distribution in certain circumstances.[4] That right, they say, will not be affected in the merger as the Time Series BB Preferred will be protected by an identical provision in Time's charter.

Second, it is argued that Section 3.4(i), which requires supermajority approval by the Series B Preferred shares in order to amend Warner's certificate of incorporation or bylaws "so as to affect adversely" the Series B Preferred, does not grant defendants a vote in the back-end merger because it is the merger, not the amendments to the certificate of incorporation, that will (presumably) adversely affect defendants.

### IV.

In evaluating these contending positions, it should first be noted that the existence and extent of special stock rights are determined by reference to the issuer's certificate of incorporation; such rights are essentially contractual in nature. *Rothschild International Corp. v. Liggett Group, Inc.*, Del.Supr., 474 A.2d 133, 136

---

4. That provision reads as follows:

The Corporation may issue the Preferred Stock in series. The Board of Directors shall have authority to establish and designate each such series before issuance, to distinguish the shares of each series from shares of all other series, and to fix the number of shares included in each such series and, except as otherwise provided in this Article, the variations in the relative rights, preferences and limitations as between series, provided that when the stated dividends and amounts payable on liquidation are not paid in full, the shares of all series of Preferred Stock shall share ratably in the payment of dividends including accumulations, if any, in accordance with the sums which would be payable on such shares if all dividends were declared and paid in full, and in any distribution of assets other than by way of dividends in accordance with the sums which would be payable on such distribution if all sums payable were discharged in full.
. . . .

(1984); *Wood v. Coastal States Gas Corp.*, Del.Supr., 401 A.2d 932, 937 (1979); *Ellingwood v. Wolf's Head Oil Refining Co.*, Del.Supr., 38 A.2d 743, 747 (1944). In determining them, a court should apply the same techniques of contract interpretation generally applied to contractual disputes. Thus, the certificate of designation should be construed in its entirety, and an attempt should be made to reconcile all of the certificate's provisions "in order to determine the meaning intended to be given to any portion of it." *Ellingwood, supra,* at 747. *See Wood, supra,* at 937. While the effort is to arrive at the intended meaning of the words employed, it is generally said that rights or preferences over common stock should be clearly expressed and not presumed. *Rothschild, supra,* at 136; *Ellingwood, supra,* at 747; *Rainbow Navigation, Inc. v. Yonge,* Del.Ch., C.A. No. 9432, 1989 WL 40805 (April 24, 1989).

## V.

For the reasons set forth below, I conclude that defendants' claims are not sound and that plaintiffs are entitled to declaratory judgment to the effect that they seek. This conclusion follows from the following, more detailed conclusions that:

    1. Section 3.4(i) does not create a right to a class vote on the proposed merger despite the fact that Warner's certificate of incorporation is being amended in the merger because, in the circumstances, the amendment itself will not "adversely affect" the Series B Preferred. (*See* pp. 967–968, *infra* );

    2. Assuming Section 3.3(i) covers "rights" other than those created by the ratability provision of Warner's charter (*see* note 6 regarding that assumption), then with respect to alteration or change of such rights by charter amendment, the same reasoning that supports the conclusion that the proposed merger does not trigger a class vote under Section 3.4(i) requires an identical conclusion with respect to 3.3(i). (*See* pp. 968–969, *infra* ).

    3. If the amendment of Warner's certificate does not trigger the class vote provisions of either 3.4(i) or 3.3(i), the dispositive question becomes whether the merger itself may trigger that result under the language of Section 3.3(i). Stated differently, the core issue here may be said to be whether the predicate words of Section 3.3(i), "alter or change," are to be read to include "convert pursuant to a merger." I conclude that Section 3.3(i) does not create a right to a class vote on a merger that will convert the Series B Preferred stock into other securities, other property or cash. (*See* pp. 968–971 *infra* ).

### A.

    ■  As here pertinent, Section 3.4(i) provides a right to a series vote (*i.e.,* the Series B Preferred voting alone) in the event of a charter amendment that amends, alters or repeals any provision of the certificate of incorporation so as to adversely affect the Series B Preferred or its holders.

Warner will be the surviving corporation in the proposed merger. Its charter will be amended in the merger. It is assumed that the substitution of the merger consideration for the Series B Preferred stock is damaging to defendants. Nevertheless, Section 3.4(i) does not, in my opinion, grant a right to a series vote in these circumstances because the adverse effect upon defendants is not caused by an amendment, alteration or repeal of any provision of Warner's certificate of incorporation. Rather, it is the conversion of the Warner Series B Preferred into Time Series BB Preferred that creates the adverse effect. But the conversion of the Warner Series B Preferred into the Time BB Preferred does not depend to any extent upon the amendment of the Warner certificate of incorporation under Section 242 of the General Corporation Law. That conversion will occur pursuant to Section 251 of the statute which authorizes mergers and defines the steps necessary to effectuate a merger.

Given that the merger itself is duly authorized,[5] the conversion of the Series B

---

5. There is no claim that Section 242(b)(2),    which does create a right to a class vote when a

Preferred stock could occur without any prior or contemporaneous amendment to the certificate. Since the merger does contemplate the conversion of the Series B Preferred into the securities of another company, it is to be expected that the certificate would be amended to reflect the removal of these securities from the firm's capital structure. Section 243 requires such a step as a housekeeping matter, but that section does not require that amendment to be contemporaneous with the retirement of the stock and it surely does not make conversion of the stock dependent upon the amendment it contemplates. Rather, the amendment contemplated is necessitated by the merger; such an amendment, like the conversion, flows from the merger and is not a necessary condition of it. Stated in terms of the language of Section 3.4(i), given the existence of the merger, the amendments of the certificate of incorporation can in no event themselves be said to "affect" BHC "adversely," even if one assumes, as I do on this motion, that the substitution of the Time BB Preferred stock for Warner Series B Preferred stock does have an adverse affect.

### B.

■ I turn then to Section 3.3(i). It requires a class vote (the Series B stock voting with any other series of preferred stock that has a vote on the question presented) in order to: "alter or change any rights ... of the Preferred stock so as to affect the holders of all such shares adversely." The central concern of Section 3.3(i) is action that would "alter or change" rights of the "Preferred Stock." [6]

In addressing Section 3.3(i), it is analytically helpful to break down the universe of acts that might arguably "alter or

change ... rights of Preferred Stock" into two classes: amendments to a certificate of incorporation and other forms of acts, such as mergers, that might affect the holders of preferred stock.

At first blush, Section 3.3(i) appears to be principally directed to charter amendments, because under Delaware law, special stock rights and preferences are set forth in a corporate charter. Such rights must be stated in, or derivable in a manner clearly set forth in, the certificate of incorporation (8 *Del.C.* § 151(a)) or set forth in a certificate of designation which, when effective (8 *Del.C.* § 103), amends and becomes a part of the certificate of incorporation (8 *Del.C.* § 151(g)).

Insofar as Section 3.3(i) does address charter amendments, the amendments that will follow the Warner–Time merger fail to trigger its provisions for the same reason that those amendments fail to trigger a series vote under Section 3.4(i): the amendments contemplated in the merger will not themselves adversely affect the preferred stock.

■ The pending motion may thus be seen to come down to the question whether the class vote contemplated by Section 3.3(i) can, in addition to being triggered by an amendment to the certificate of incorporation that "alters ... rights ... adversely," be triggered by other forms of transactions in which the interests of holders of the preferred—and arguably "the rights ... of the Preferred Stock"—are adversely affected. Specifically, does Section 3.3(i) reach mergers?

Will the Series B Preferred be altered or changed in the merger within the meaning of Section 3.3(i)? Concededly, the shares

---

charter amendment alters or changes the rights of the shares of a particular class of stock, itself creates a right to a class vote on the merger.

**6.** For purposes of this motion, I assume but do not decide that defendants are correct that "any rights ... of Preferred Stock" is not limited to those rights *necessarily* shared by every series of preferred stock because conferred in a provision of the certificate of incorporation of general applicability (*i.e.*, in this instance, the ratability provision quoted in note 4), but would extend

to any rights of holders of preferred stock (and perhaps varying rights with respect to a single "matter"). It is remarkable, in any event, how much overlap exists between Sections 3.3(i) and 3.4(i). The latter section is broader in several respects—it covers all charter amendments, not simply those altering the terms of preferred stock; it covers bylaw amendments; it includes adverse effects upon "holders" as well as upon the stock.

of that stock will be converted into a new security by operation of law in the merger. Did the parties that drafted Section 3.3(i) intend conversion of stock in a merger to be contemplated within the phrase "alter or change?" I cannot conclude, viewing the certificate of designation in its entirety, that there is even a reasonable likelihood that they did.

The draftsmen of this language—the negotiators to the extent it has actually been negotiated[7]—must be deemed to have understood, and no doubt did understand, that under Delaware law (and generally) the securities whose characteristics were being defined in the certificate of designation could be converted by merger into "shares or other securities of the corporation surviving or resulting from [a] merger or consolidation" or into "cash, property, rights or securities of any other corporation." 8 *Del.C.* § 251(b); *Federal United Corporation v. Havender,* Del.Supr., 11 A.2d 331 (1940). Those shares, for example, could be converted into a right to receive cash or other property in a merger and such a conversion would not entitle a holder of stock with a stated value upon liquidation to that value (*Rothschild, supra*); nor would such a cash out merger constitute a redemption of callable securities. *Dart v. Kohlberg, Kravis, Roberts & Co.,* Del.Ch., C.A. No. 7366, Hartnett, V.C., 1985 WL 21145 (May 6, 1985), slip op. at 13.

It is thus elementary that the possibility of a merger represents a possibility of the most profound importance to a holder of stock with special rights or preferences. *See generally* Buxbaum, Preferred Stock—Law and Draftsmanship, 42 Calif.L.Rev. 243, 298–309 (1954). When one turns to the certificate of designation to ascertain whether the language of Section 3.3(i) was intended to incorporate changes effected through mergers, one is struck by two factors that together compel the conclusion that it was not. The first is the close similarity between the operative language of Section 3.3(i) and Section 242(b)(2) of the

General Corporation Law. The second involves a comparison of the language of Section 3.3(i) with other sections of the certificate of designation in which the drafters of that document specifically and expressly treated the possibility of a future merger.

The language of Section 3.3(i) is closely similar to the language of Section 242(b)(2) of the corporation law statute governing amendments to a certificate of incorporation. That section creates a right to a class vote under certain circumstances. It provides in pertinent part:

> The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment ... if the amendment would ... *alter or change the powers, preferences or special rights of the shares of such class so as to affect them adversely.*

8 *Del.C.* § 242(b)(2) (emphasis added).

The parallel language of Section 3.3(i), as quoted above, provides in pertinent part:

> ... the affirmative vote of at least two-thirds of the ... outstanding shares of Series B Stock ... shall be necessary *to alter or change any rights, preferences or limitations of the Preferred Stock so as to affect* the holders of all such stock adversely.

Certificate of Designation, Section 3.3 (emphasis added).

The parallel is plain. It is therefore significant, when called upon to determine whether Section 3.3(i) creates a right to a class vote on a merger, to note that the language of Section 242(b)(2) does not itself create a right to a class vote on a merger. The voting requirements for a merger are generally set forth in Section 251(c) of our corporation law statute.[8] Under Section 251, unless a charter provision creates a right to a class vote, a merger is authorized by the company's shareholders when "a majority of the outstanding stock of the corporation entitled to vote thereon shall be

---

**7.** In all events, it is agreed that Section 3.3 was not negotiated by Chris–Craft or BHC, but comes precisely from the terms of prior issues of Warner preferred stock.

**8.** *But see* 8 *Del.C.* § 251(f) (stating narrow exceptions to voting requirement).

voted for the adoption of the agreement [of merger]." 8 *Del.C.* § 251(c). Unlike Section 242(b), Section 251 contains no class vote requirement.

Our bedrock doctrine of independent legal significance (*e.g., Orzeck v. Englehart*, Del.Supr., 195 A.2d 375 (1963); *Rothschild, supra*) compels the conclusion that satisfaction of the requirements of Section 251 is all that is required legally to effectuate a merger. It follows, therefore, from rudimentary principles of corporation law, that the language of 242(b)(2), which so closely parallels the language of 3.3(i), does not entitle the holders of a class of preferred stock to a class vote in a merger, even if (as we assume here) the interests of the class will be adversely affected by the merger.[9] *See, e.g., Dart v. Kohlberg, Kravis, Roberts & Co., supra.* Indeed, this is so apparent that Chris–Craft does not argue that it has such rights under Section 242.

Since I take this legal conclusion to be the general understanding among corporation law specialists (*e.g.,* Buxbaum, 42 Calif.L.Rev. at 294, n. 266), I can only conclude that it is extraordinarily unlikely that the drafters of Section 3.3(i), who obviously were familiar with and probably expert in our corporation law, would have chosen language so closely similar to that of Section 242(b)(2) had they intended a merger to trigger the class vote mechanism of that section.

This conclusion is further supported by a review of other provisions of the certificate of designation. These provisions demonstrate that the drafters were mindful of the effects a merger might have and shaped some special protections in light of the risks posed. For example, Section 6.7 specifically creates protections for the convertibility feature of the Series B Preferred "... in case of any consolidation or merger of the Corporation with or into another corporation...." More pointedly, the drafters did expressly address the possibility of a merger in connection with the very question of a class vote by the preferred and adopted the limited protection afforded by Section 3.4(iii):

> So long as any shares of Series B Stock shall be outstanding ... without first obtaining the consent or approval of the holders of at least two-thirds of the number of shares of the Series B Stock at the time outstanding ... the Corporation shall not ... (iii) *be a party to any transaction involving a merger,* consolidation or sale of all or substantially all of the Corporation's assets *in which* the *shares of Series B Stock* either remain outstanding or *are converted into the right to receive equity securities of the* surviving, resulting or *acquiring corporation* (meaning the corporation whose securities are delivered in exchange for assets or securities of the Corporation) *unless such corporation shall have,* after such merger, consolidation or sale, *no equity securities either authorized or outstanding* (except such stock of the Corporation as may have been authorized or outstanding immediately preceding such merger or consolidation or such stock of the surviving, resulting or acquiring corporation as may be issued in exchange therefor) *ranking prior,* as to dividends or in liquidation, *to the Series B Stock or to the stock of the surviving, resulting or acquiring corporation issued in exchange therefor.*

Certificate of Designation, Section 3.4 (emphasis added).

Thus, in Section 3.4(iii), the certificate of designation does specifically address the voting requirements of a corporate transaction that would "convert" the Series B Preferred to the securities of another corporation and creates a right to a class vote in a subset of all such cases: when the "surviv-

---

**9.** In *Dalton v. American Investment Company,* Del.Ch., 490 A.2d 574 (1985), *aff'd,* Del.Supr., 501 A.2d 1238 (1985), this court rejected a claim that because their shares would be adversely affected by a merger, the holders of a class of preferred stock were entitled to a class vote. There the court addressed the matter factually and found no adverse effect. *Dalton* only accepted *per arguendo* the theory that Section 242(b)(2) created a right to a class vote on a merger that would adversely affect preferred shares; it would be an error, in my opinion, to read that case as an implicit acceptance of that theory.

ing, resulting or acquiring corporation" has no equity securities ranking prior to the Series B Preferred except any securities that ranked prior to it before the transaction. The parties agree that Section 3.4(iii) does not require a class vote here.

This section does not explicitly preclude the possibility of a certificate-created requirement for a class vote upon a merger which does not insert prior equity into the capital structure of the firm. Nevertheless, the only fair inference from Section 3.4(iii) is that it was intended to provide the only certificate-created requirement for a series or class vote upon a merger.

Can Section 3.3(i) fairly be read to contradict that obvious inference? Far from contradicting it, the reading of that section implied by the parallel with Section 242(b)(2) supports the conclusion that the certificate of designation creates no right for the Series B Preferred to a class vote with respect to the proposed Warner–Time merger.

█ I recognize that this interpretation of Section 3.3(i) threatens to render it redundant in light of Section 3.4(i).[10] An interpretation that gives an effect to each term of an agreement, instrument or statute is to be preferred to an interpretation that accounts for some terms as redundant. However, no plausible interpretation of Sections 3.3(i) and 3.4(i) and (iii) has been suggested that would accomplish that task here. Not only do I find implausible any interpretation of Section 3.3(i) that would extend its words to a merger in which the Series B Preferred was converted into another security, but such an interpretation— while giving Section 3.3(i) some room to operate—would render Section 3.4(iii) redundant. Thus, the problem of redundancy seems inescapable.

\* \* \* \* \* \*

For these reasons, I conclude that the Warner certificate of incorporation does not afford to BHC, as the holder of the Series B Preferred stock, a right to vote upon the proposed Warner–Time merger as

a separate class. Plaintiffs may submit a form of implementing order on notice.

---

10. It does not quite render Section 3.3(i) redundant as this case presents no occasion to consider corporate transactions, other than mergers and charter amendments, that might arguably affect preferred stock under Section 3.3(i). *E.g.,* dissolution.