# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHEN GUNDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1029-PAF |
| | ) | |
| THE TRADE DESK, INC., JEFF GREEN, | ) | |
| LISE BUYER, ANDREA CUNNINGHAM, | ) | |
| KATHRYN FALBERG, GOKUL RAJARAM, | ) | |
| DAVID WELLS, and SAMANTHA | ) | |
| JACOBSON, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: October 30, 2024
Date Decided: November 6, 2024
Date Corrected: November 8, 2024

Gregory V. Varallo, Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Christopher J. Orrico, Shiva Mohan, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Jeremy S. Friedman, David F.E. Tejtel, Alexander M. Krischik, David A. Rosenfeld, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; Joel Fleming, Lauren Godles Milgroom, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts; D. Seamus Kaskela, Adrienne Bell, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Attorneys for Plaintiff Stephen Gunderson*.

Brad D. Sorrels, Andrew D. Cordo, Nora M. Crawford, Lauren G. DeBona, Jacqueline G. Conner, WILSON SONSINI GOODRICH & ROSATI P.C., Wilmington, Delaware; Colleen C. Smith, LATHAM & WATKINS LLP, San Diego, California; Blair Connelly, Zachary L. Rowen, Thomas Giblin, LATHAM & WATKINS LLP, New York, New York; Ryan A. Walsh, LATHAM & WATKINS LLP, Costa Mesa, California; David J. Berger, WILSON SONSINI GOODRICH &

ROSATI P.C., Palo Alto, California; *Attorneys for Defendants The Trade Desk, Inc, Jeff Green, Lise Buyer, Andrea Cunningham, Kathryn Falberg, Gokul Rajaram, David Wells, and Samantha Jacobson.*

**FIORAVANTI, Vice Chancellor**

The board of directors of a Delaware corporation has recommended that the corporation reincorporate as a Nevada corporation. The board has proposed to effect the reincorporation through a conversion under Section 266 of the Delaware General Corporation Law (the "DGCL"). Under Section 266, the conversion must be approved by a majority of the outstanding shares of stock of the corporation entitled to vote upon the proposal. The corporation's chief executive officer controls approximately 49% of the outstanding voting power. Thus, the conversion is almost certain to receive the requisite majority vote under the statute.

Article X of the corporation's certificate of incorporation, however, requires the approval of 66 2/3% of the outstanding voting power of the corporation's stock, voting as a single class, "to amend or repeal, or adopt any provision" of the certificate inconsistent with certain enumerated articles of the certificate. There is no dispute that upon conversion, the Nevada corporation will possess a certificate of incorporation that is inconsistent with some of the enumerated articles.

A stockholder of the corporation alleges in his complaint that the conversion is subject to the higher voting requirement in Article X. This is so, says the Plaintiff, because the conversion will result in the amendment and repeal of the certificate and the adoption of provisions inconsistent with the articles enumerated in Article X. The Plaintiff seeks an order enjoining the corporation from proceeding with the conversion unless the corporation and the directors apply the supermajority vote

threshold in Article X and make additional disclosures about the required vote threshold to the stockholders.

The Defendants, relying on the doctrine of independent legal significance and a line of cases from this court and the Delaware Supreme Court over the past 35 years, argue that the conversion is not subject to the supermajority vote requirement in Article X. For the supermajority vote requirement to apply in this instance, according to the Defendants, additional language is required to specify Article X's applicability outside of Section 242 of the DGCL, which governs amendments to the certificate. Here, Article X does not contain that additional language and therefore, according to the Defendants, it does not apply in this instance.

Both sides have moved for summary judgment in their favor on these specific claims, and the court has considered the motions on an expedited basis. At oral argument, Plaintiff conceded that if the Defendants had chosen to accomplish the reincorporation through a merger under another section of the DGCL, then approval would not require a supermajority vote under Article X. This concession, in the court's view, is fatal to many of the Plaintiff's arguments. But even without Plaintiff's having made that concession, the court concludes that the heightened vote threshold under Article X does not apply to the conversion.

Accordingly, the court grants the Defendants' motion and denies the Plaintiff's motion. Given that the proposed vote on the conversion is scheduled for November

14, 2024, the court will enter a partial final judgment under Court of Chancery Rule 54(b), enabling the Plaintiff to seek an expedited appeal if he is so inclined.

## I.    BACKGROUND

The following undisputed facts are pertinent to the issue before the court.

### A.    The Certificate of Incorporation

The Trade Desk, Inc. ("Trade Desk" or the "Company") was formed in 2009 as a Delaware corporation.[1]  In September 2016, the Company went public in an initial public offering (the "IPO").[2]  In the IPO, the Company created a dual-class stock structure.[3]  The Company's Class A common stock is publicly traded and entitles the holder to one vote per share.[4]  The Company's Class B stock, which is not publicly traded, entitles the holder ten votes per share.[5]

Jeff Green, the Company's co-founder, current director, and Chief Executive Officer, owns over 97% of the Class B common stock.[6]  Green's combined ownership of Class A and Class B common stock gives him approximately 49% of

---

[1] Dkt. 21 ¶ 17 ("Compl."); Dkt. 17 Ex. A at 1 ("Certificate").

[2] Compl. ¶ 18.

[3] *Id.*; The Trade Desk, Inc., Schedule 14A (Oct. 27, 2020) at 12.  "The court may take judicial notice of facts publicly available in filings with the SEC." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del. 1995)).

[4] Compl. ¶ 18.

[5] *Id.*

[6] *Id.* ¶¶ 10, 17, 19.

the Company's voting power.[7]  The Company acknowledges that Green is its controlling stockholder.[8]

In connection with its IPO, the Company amended its certificate of incorporation (the "Certificate").[9]  Among the amendments was the addition of Article X.[10]  As discussed and analyzed later in this opinion, Article X requires "the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the outstanding shares of stock of the Corporation entitled to vote thereon, voting together as a single class," "to amend or repeal, or adopt any provision of this Restated Certificate inconsistent with, ARTICLE VI, ARTICLE VII, ARTICLE VIII, ARTICLE IX or this ARTICLE X of this Restated Certificate."[11]  Plaintiff defines Articles VI through X of the Certificate as the "Protected Provisions."  For ease of reference, this opinion adopts that definition.

---

[7] *Id.* ¶ 19.

[8] Dkt. 17 Ex. D at 10 (The Trade Desk, Inc. Definitive Proxy Statement, dated October 3, 2024) ("Proxy").

[9] Compl. ¶ 18.

[10] *Id.* ¶¶ 20–21.

[11] Certificate Art. X.  In 2020, the certificate adopted in connection with the Company's IPO was amended and restated, but Article X was unchanged.  *See* Compl. ¶ 21 n.9.

## B. The Proposed Conversion

On September 20, 2024, the Company's Board of Directors (the "Board") approved a resolution to reincorporate Trade Desk as a Nevada corporation.[12] The vehicle by which the Board proposes to transport the Company from Delaware to Nevada is Section 266 of the DGCL (the "Conversion").[13] Under Section 266, a conversion requires the approval of a majority of the voting power of the outstanding stock entitled to vote, absent a greater requirement in the certificate.[14]

On October 3, 2024, the Company filed notice of a special meeting to be held on November 14, 2024 (the "Special Meeting").[15] The definitive proxy statement (the "Proxy") that accompanied the meeting notice explains that, upon stockholder approval, the Company intends to file a certificate of conversion and, thereby, convert the Company from a Delaware corporation governed by the Certificate into a Nevada corporation governed by a separate instrument (the "Nevada Certificate").[16]

---

[12] Compl. ¶ 29.

[13] Proxy at 8.

[14] 8 *Del. C.* § 266(b).

[15] Compl. ¶ 5.

[16] Proxy at 8. According to the Proxy, the decision to reincorporate was "in response to a number of factors, including developments in the competitive and regulatory landscape in which [the Company] compete[s] and views regarding the legal landscape in Delaware." *Id.* at 9. The Company and Board contend that "[t]he increasingly litigious environment

According to the Proxy, the Conversion requires the approval of "a majority of the voting power of the shares outstanding and entitled to vote."[17]

## C. Procedural History

On October 4, 2024, Plaintiff Stephen Gunderson filed this action against the Company's directors (the "Director Defendants") and the Company itself.[18] Plaintiff alleges that Article X of the Certificate requires the approval of the holders of 66 2/3% of the voting power of the outstanding shares of stock of the corporation entitled to vote on the Conversion (a "Supermajority"). Plaintiff argues that the Conversion will amend and repeal the Certificate and adopt provisions inconsistent with the Protected Provisions, thus requiring a Supermajority vote. Consequently, according to Plaintiff, the Company and Board have breached the Certificate and have necessarily breached their fiduciary duties by failing to disclose that approval of the Conversion requires a Supermajority vote.

---

facing corporations with controlling stockholders has created unpredictability in decision-making and has started to impede [the Company's] ability to act quickly." *Id.* at 11. Specifically, the Defendants point to two recent stockholder actions in this court challenging decisions of the Board that benefited Green. In one case, this court granted a motion to dismiss claims against Green and the Board concerning an amendment to the Company's certificate of incorporation that had the effect of extending Green's voting control. *See generally City Pension Fund for Firefighters & Police Officers in the City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959 (Del. Ch. July 29, 2022). The second action challenges Green's compensation. Motions to dismiss that complaint are awaiting decision. *See In re The Trade Desk, Inc. Deriv. Litig.*, 2022-0461-PAF (Del. Ch.).

[17] Proxy at 4; *see also id.* at 40.

[18] Dkt. 1.

6

Plaintiff filed motions to expedite and for a preliminary injunction with his complaint.[19] In briefing the motion to expedite, both sides agreed that the issue was one solely of law. Accordingly, the court granted the motion to expedite and directed the parties to file and brief cross-motions for summary judgment.[20] The parties filed and briefed cross-motions on Counts I and II of the Amended Complaint (the "Cross-Motions"),[21] and the court heard argument on the Cross-Motions on October 30, 2024.[22]

## II.   ANALYSIS

The sole issue before the court is whether a Supermajority stockholder vote is required to approve the Conversion.[23] Plaintiff argues that Article X requires Supermajority approval. Defendant argues that Article X does not apply to the

---

[19] *Id.*

[20] Dkt. 13.

[21] Dkt. 17 ("Pl.'s Opening Br."); Dkt. 20 ("Defs.' Answering & Opening Br."); Dkt. 24 ("Pl.'s Reply & Answering Br."); Dkt. 25 ("Defs.' Reply Br.").

[22] Dkt. 30. On October 24, 2024, while the parties were briefing the Cross-Motions, the Plaintiff filed his Amended Complaint, adding two counts challenging the substantive fairness of the Conversion, for the purpose of preserving those claims. *See* Dkt. 21. This opinion does not address these additional counts.

[23] It is well established that "director action is 'twice-tested,' first for legal authorization, and second by equity." *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017) (citing A. A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931)) (additional citation omitted). The Cross-Motions focus on the first test—legal authorization. *See* Pl.'s Reply & Answering Br. 7 ("The Court is, thus, asked to answer one question: does the [Conversion] trigger Article X's Supermajority Approval Requirement?"). Plaintiff has sought to preserve his ability to challenge the substantive fairness of the Conversion under equity at a later stage. *See supra* note 22.

Conversion and that, therefore, only majority approval under Section 266 of the DGCL is required.

### A. Standards of Review

#### 1. Standard for Summary Judgment

Under Court of Chancery Rule 56, summary judgment may be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). Where, as here, the parties have filed cross-motions for summary judgment and "have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." Ct. Ch. R. 56(h).

#### 2. Standard for a Permanent Injunction

The two counts of the Amended Complaint at issue in the Cross-Motions are intertwined. Count I alleges that the Company is breaching the Certificate by effecting the Conversion without the required vote under Article X. Count II alleges the Director Defendants have breached their fiduciary duties by failing to disclose that the Conversion requires a Supermajority vote under Article X.

Plaintiff seeks a permanent injunction preventing the stockholder vote on the Conversion and its consummation. To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction." *In re COVID-Related*

8

*Restrictions on Religious Servs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 2024 WL 3616269 (Del. Aug. 1, 2024).

## B.     Section 266 of the DGCL

Defendants propose to effect the Conversion under Section 266 of the DGCL. Section 266 enables Delaware corporations to convert directly into another form of artificial entity.[24]  Section 266 was enacted in 1999.  Before enactment of Section 266, the end result of a conversion could be achieved by merging with a strawman subsidiary.  But "mergers for purposes of conversions were believed by some to carry the specter of contractual, regulatory, and tax problems, should the surviving entity be deemed to have a legal identity separate from its predecessor." 2 David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporation Law & Practice* § 35.06 (2022).  Section 266 addressed these concerns, expressly providing that a statutory conversion had no effect on obligations or liabilities between the two forms.  8 *Del. C.* § 266(e).  Although a conversion has no effect on the converted enterprise's obligations and liabilities, the same cannot be said regarding the corporation's legal existence as a Delaware corporation.  Section 266 specifies that, at the effective time, "the corporation shall cease to exist as a corporation of this State."  8 *Del. C.* § 266(d); *see also* 8 *Del. C.* § 266(e) (stating

---

[24] The inverse effect—conversion of another type of entity into a Delaware corporation—may be achieved under Section 265, which was adopted with Section 266 and addresses the same concerns.  72 Del. Laws 1999, ch. 123, §§ 10–11, eff. July 1, 1999.

that the result under the statute is the "cessation of [the corporation's] existence as a corporation of this State pursuant to a certificate of conversion to non-Delaware entity").

For the first 23 years of its existence, Section 266 had no practical utility for a corporation whose stock was widely held. During that time, a conversion required the approval of "all outstanding shares of stock of the corporation, whether voting or nonvoting." 72 Del. Laws 1999, ch. 123, § 11, eff. July 1, 1999. In 2022, the General Assembly amended the statute to require, by default, only "a majority of the outstanding shares of stock of the corporation entitled to vote thereon." 83 Del. Laws 2022, ch. 377, § 11, eff. July 27, 2022. Thereby, the General Assembly brought Section 266's default voting requirement in accord with that for mergers and consolidations. *Compare* 8 *Del. C.* § 266(b) (requiring approval of "a majority of the outstanding shares of stock of the corporation, entitled to vote thereon"), *with* 8 *Del. C.* § 251(c) (requiring approval of "a majority of the outstanding stock of the corporation entitled to vote thereon").

The drafters of the 2022 amendment sought to ensure that the new majority vote requirement for a conversion would not be used to evade preexisting certificate provisions that required a supermajority vote for mergers and consolidations. To that end, the General Assembly included Section 266(k):

> Any provision of the certificate of incorporation of a corporation incorporated before August 1, 2022, or any provision in any voting trust

agreement or other written agreement between or among any such corporation and 1 or more of its stockholders in effect on or before August 1, 2022, that restricts, conditions or prohibits the consummation of a merger or consolidation shall be deemed to apply to a conversion as if it were a merger or consolidation unless the certificate of incorporation or such agreement expressly provides otherwise.

The rationale for Section 266(k) is easy to discern. Prior to the amendment to the voting requirement, corporate drafters had no reason to directly address Section 266, as there is no stronger protective voting provision than an unwaivable unanimity requirement that requires the consent even of non-voting stock. By statutorily adding conversions into any provision expressly addressing mergers or consolidations, the General Assembly ensured that Section 266's alternative to strawman transaction structures was no more accessible than the transactions it was designed to simplify. Thereby, Section 266(k) preserves the settled expectations of corporations, stockholders, and corporate drafters by placing Section 266 on even ground with mergers and consolidations.

### C.   Article X's Supermajority Vote Requirement

The disposition of the Cross-Motions turns on the meaning of Article X.[25] The construction or interpretation of a corporate certificate is a question of law.

---

[25] Mechanically, Count I alleges a claim for breach of contract against the Company, seeking an injunction preventing the Company from effecting the Conversion without obtaining Supermajority approval. To prevail on his claim for breach of contract, Plaintiff must show "(i) a contractual obligation, (ii) a breach of that obligation by the defendant,

11

*Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 336 (Del. 2022); *Centaur Pr's, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990). Thus, the court turns to the principles used to determine the meaning of the Certificate, which are the same as the principles used to interpret contracts. *See Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 342–43 (Del. 1983) ("[T]he rules which are used to interpret statutes*,* contracts, and other written instruments are applicable when construing corporate charters and bylaws."); *accord Matulich v. Aegis Commc'ns Gp., Inc.*, 942 A.2d 596, 600 (Del. 2008).

"Delaware adheres to the objective theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted)). When a contract is clear and unambiguous, the

---

and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). The only point of contention with respect to Count I is whether the Company is obligated to obtain Supermajority approval of the Conversion.

Count II alleges a claim for breach of the Director Defendants' fiduciary duty of disclosure. To succeed on his claim for breach of fiduciary duty, Plaintiff must prove by a preponderance of the evidence "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002) (TABLE). When directors seek stockholder action, directors have "'a fiduciary duty to disclose fully and fairly all material information within the board's control[.]'" *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 62 (Del. 2022) (alteration in original) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). The only point of contention with respect to Count II is whether the Director Defendants have accurately disclosed the necessary voting threshold for the Conversion's approval.

court "will give effect to the plain-meaning of the contract's terms and provisions." *Id.* at 1159–60. The court "will read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010). "This approach places great weight on the plain terms of a disputed contractual provision, and we interpret clear and unambiguous terms according to their ordinary meaning." *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (internal quotation marks omitted), *reargument denied* (Mar. 22, 2022).

Plaintiff argues that this case begins and ends with the text and plain meaning of Article X of the Certificate. Article X states, in full:

> The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Restated Certificate, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by statute, and all rights, preferences and privileges of any nature conferred upon stockholders, directors or any other persons herein are granted subject to this reservation; *provided, however*, that, notwithstanding any other provision of this Restated Certificate or any provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of this Corporation required by law or by this Restated Certificate, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the outstanding shares of stock of the Corporation entitled to vote thereon, voting together as a single class, shall be required to amend or repeal, or adopt any provision of this Restated Certificate inconsistent with, ARTICLE VI, ARTICLE VII, ARTICLE VIII, ARTICLE IX or this ARTICLE X of this Restated Certificate.

Plaintiff contends that Article X applies the Supermajority voting standard to actions that "'amend or repeal, or adopt any provision of this Restated Certificate inconsistent with' the Protected Provisions."[26]  Pointing to dictionary definitions of "amend," "repeal," and "adopt," Plaintiff argues that, in substance, the Conversion falls within each.[27]

---

[26] Pl.'s Opening Br. 15 (emphasis omitted) (quoting Certificate Art. X).

[27] *Id.* at 20–21; Pl.'s Answering & Reply Br. 10–11.  Setting aside "repeal" for the moment, both amendment and adoption directly refer to changes *within* the "Restated Certificate," as defined.  By its plain language, Article X applies only to acts that "amend [specific provisions of] this Restated Certificate," "adopt any provision of this Restated Certificate inconsistent with [specific provisions]," or "repeal [specific provisions of] this Restated Certificate."  Certificate Art. X.  The Certificate defines "Restated Certificate" as "this Amended and Restated Certificate of Incorporation."  *Id.* Art. IV § B.  Plaintiff correctly notes that this does not merely refer to the exact iteration of the Company's certificate, as amended in 2020.  *See* Pl.'s Reply & Answering Br. 14–16.  As Section 104 of the DGCL explains:

> The term "certificate of incorporation," as used in this chapter, unless the context requires otherwise, includes not only the original certificate of incorporation filed to create a corporation but also all other certificates, agreements of merger or consolidation, plans of reorganization, or other instruments, howsoever designated, which are filed pursuant to § 102, §§ 133-136, § 151, §§ 241-243, § 245, §§ 251-258, §§ 263-264, § 267, § 303, §§ 311-313, or any other section of this title, and which have the effect of amending or supplementing in some respect a corporation's certificate of incorporation.

Conspicuously absent from Section 104's definition of "certificate of incorporation," however, is reference to Sections 265 and 266, the provisions governing conversion of another entity into a Delaware corporation and conversion of a Delaware corporation into another entity, respectively.  This court "assume[s] that the Legislature was aware of the omission and intended it," and will not "engraft upon a statute language which has been clearly excluded therefrom by the Legislature."  *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982); *accord Wilm. Tr. Co. v. Barry*, 338 A.2d 575, 578 (Del. Super. 1975)

14

Defendants argue that the Supermajority vote requirement in Article X applies only to action taken under Section 242 of the DGCL, which specifically applies to certificate amendments. *See In re Fox Corp./Snap Inc.*, 312 A.3d 636, 645 (Del. 2024), *as revised* (Jan. 25, 2024) ("Section 242(a) authorizes charter amendments and Section 242(b)(1) requires that stockholders approve charter amendments by the affirmative vote of a majority of the outstanding stock entitled to vote on the amendment."). Because the Conversion is governed by Section 266 of the DGCL, the Defendants invoke the doctrine of independent legal significance and decades of

---

("Unless a legislative intent to have a statute read in a certain manner is ascertainable from other parts of a statute, courts proceed with great caution in supplying omissions therein."), *aff'd*, 359 A.2d 664 (Del. 1976) (Mem.). Furthermore, consultation with Sections 265 and 266 confirms that this omission was intentional. Section 266 only refers to a "certificate of incorporation" three times—once to provide that the certificate of conversion must certify the date of the filing of the original certificate of incorporation, 8 *Del. C.* § 266(c)(2), and twice in its extension of certificate provisions restricting mergers or consolidations to conversions, 8 *Del. C.* § 266(k). By contrast, Section 265 requires the filing of a certificate of incorporation in accordance with Section 103. 8 *Del. C.* § 265(b)(2). Considered together, Sections 104, 265, and 266 indicate that, for the purposes of the DGCL, the natural continuity of a "certificate of incorporation" across iterations occurs within the Delaware corporate form but does not extend to other entities prior to or after a statutory conversion. It follows therefrom that neither the instruments necessary to be filed to effect a conversion under either provision nor the certificate or equivalent document of the preceding or succeeding entity fall within the definition of "certificate of incorporation." As applied here, the Nevada Certificate does not fall within the definition of "Restated Certificate" as employed in Article X. Article X provides that a Supermajority vote is required to "amend [specific provisions of] this Restated Certificate" or "adopt any provision of this Restated Certificate inconsistent with [specific provisions]." Because the Nevada Certificate is not an iteration of the continuous "Restated Certificate," the effect of the cessation of the effectiveness of the Certificate and commencement of the effectiveness of the Nevada Certificate is not to "amend" or "adopt" any provision of the "Restated Certificate," and neither phrase is implicated here.

case law from the Delaware Supreme Court and this court for the proposition that the Supermajority vote provision in Article X could only apply if it contained specific language extending its reach to mergers, consolidations, conversions, or similar transactions. A discussion of that case law helps to place the Plaintiff's plain meaning argument in context.

### 1. The doctrine of independent legal significance and *Warner*, *Avatex*, and their progeny are controlling.

The foundation of Defendants' argument is the doctrine of independent legal significance. "[T]he doctrine of independent legal significance holds that legal action authorized under one section of the corporation law is not invalid because it causes a result that would not be achievable if pursued through other action under other provisions of the statute." *SIPCA Hldgs. S.A. v. Optical Coating Lab'y, Inc.*, 1997 WL 10263, at *5 (Del. Ch. Jan. 6, 1997). The quintessential example of this principle's application is embodied by comparison of *Keller v. Wilson & Co., Inc.*, 190 A. 115 (Del. 1936), where the Delaware Supreme Court found null and void a certificate amendment purporting to eliminate accrued preferred dividends, and *Federal United Corp. v. Havender*, 11 A.2d 331 (Del. 1940), which permitted an identical effect to occur through a merger. As the *Havender* court explained, "[t]o say that the right to such dividends may not be destroyed by charter amendment . . . is not to say that the right may not be compounded under the merger provisions" because "[t]here is a clear distinction between the situations recognized by the

16

General Law and the modes of procedure applicable to each of them." 11 A.2d at 342. Though not without controversy at the time, recommendations to statutorily overrule *Havender* were rejected, and "the doctrine of independent legal significance remains a cornerstone principle of interpretation that governs the application of Delaware's business entity statutes." *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2014 WL 5667334, at *5 (Del. Ch. Nov. 5, 2014).

Defendants argue that the doctrine of independent legal significance, as applied and articulated in a long line of decisions, starting with *Warner Communications Inc. v. Chris-Craft Industries, Inc.*, 583 A.2d 962 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE), renders the Supermajority vote under Article X inapplicable to the Conversion.

*Warner* involved a challenge to a proposed merger in which the Series B Preferred Stock would be converted to a different series of preferred stock in the post-merger entity. The Series B stockholders contended that two certificate provisions granted them a vote on the transaction: section 3.3(i), which provided that a vote of the Series B "shall be necessary to alter or change any rights, preferences or limitations of the Preferred Stock so as to affect the holders of all of such shares adversely," and section 3.4(i), which provided that the corporation would not "amend, alter or repeal any of the provisions of the Certificate of Incorporation or By-laws of the Corporation so as to affect adversely any of the

17

preferences, rights, powers or privileges of the Series B" without the Series B's consent. *Id.* at 964–65.

The *Warner* court concluded that each provision only applied to certificate amendments under Section 242 of the DGCL. As the court explained, section 3.4(i) facially only provided a vote to "amend, alter or repeal any of the provisions of the Certificate," plainly indicating that it was intended to modify the requirements for actions under Section 242. *Id.* at 967–68. With respect to section 3.3(i), the court acknowledged that the language could be read more broadly, but held that it, too, applied only to actions taken under Section 242, emphasizing "close similarity between the operative language of Section 3.3(i) and Section 242(b)(2)" and that another provision of the certificate expressly provided for votes on certain mergers. *Id.* at 968–71.

Having determined that these provisions applied only to certificate amendments effected pursuant to Section 242, the court held that neither provision gave the defendants a vote on the transaction, because any adverse effect resulted from a merger under Section 251, not a certificate amendment under Section 242. The court explained that the certificate's drafters "must be deemed to have understood, and no doubt did understand" the doctrine of independent legal significance. *Id.* at 969. Hence, the "bedrock doctrine of independent legal significance compel[led] the conclusion that satisfaction of the requirements of

18

Section 251 is all that is required legally to effectuate a merger." *Id.* at 970 (citations omitted).

Three years later, this court was faced with a slight twist on the certificate language at issue in *Warner*. In *Sullivan Money Management, Inc. v. FLS Holdings Inc.*, the certificate prevented the corporation from "chang[ing], by amendment to the [certificate] *or otherwise*," the terms of the preferred stock so as to adversely affect the rights and preferences of the preferred holders. 1992 WL 345453, at *2 (Del. Ch. Nov. 20, 1992), *aff'd*, 628 A.2d 84 (Del. 1993) (TABLE). This court concluded that the mere addition of "or otherwise" after a clause restricting changes "by amendment to the Certificate of Incorporation of the Corporation" was insufficient to convey a class vote on a merger with a similar effect. Acknowledging that this language was "arguably distinguishable from *Warner,* because Section B.1(H)(iii) contains a phrase not involved in *Warner* or found in § 242(b)(2)," the *FLS* court concluded that the difference had no effect on the outcome, for three reasons. *Id.* at *3. First, neither the phrase the plaintiffs highlighted nor the section in which it was found "mentions mergers at all." *Id.* Second, a class vote on mergers was provided in a separate provision of the certificate, indicating that its drafters did not intend to confer a vote on mergers in the language upon which the plaintiffs relied. *Id.* at *5. Third, the plaintiffs generally did not find support elsewhere in the certificate for their broad interpretation of "or otherwise." *Id.* at *6. Although the

19

court noted that the defendants' interpretation was not particularly compelling, the court concluded that the absence of any "words of explicit import clearly express[ing] the voting right" meant that the plaintiffs, as the party with the burden, could not prevail. *Id.* at *7.

A few years later, *Elliott Associates, L.P. v. Avatex Corp.*, 715 A.2d 843 (Del. 1998), presented a certificate provision that was much broader than those in *Warner* and *FLS*. There, the relevant portion of the Avatex certificate provided the preferred stockholders with a vote on any "amendment, alteration or repeal, *whether by merger, consolidation or otherwise*, of any of the provisions of the Restated Certificate of Incorporation" that would "materially and adversely affect" the rights or preferences of the preferred stock. *Id.* at 845 (emphasis added) (internal quotation marks omitted). The corporation proposed a merger that would result in the preferred stock being converted into common stock, effectively eliminating the certificate which had provided for the preferred stock's rights and preferences. The plaintiffs, preferred stockholders, contended that this provision afforded the preferred a vote on the transaction. The corporation contended that, as in *Warner*, the preferred had no right to vote on the transaction. In an opinion reversing this court, the Supreme Court held that the preferred stockholders were entitled to vote on the transaction because the phrase "whether by merger, consolidation or otherwise" in the Avatex certificate was "materially different from the language in

*Warner*" and "entirely changes the analysis." *Avatex*, 715 A.2d at 854. The Court construed the additional language to indicate that the provision was not limited to actions taken under Section 242. The Court reasoned: "In speaking of the 'amendment, alteration or repeal' of the Avatex certificate by 'merger, consolidation or otherwise,' the drafters must have been referring to some or all of the events permitted by Section 251. Therefore, Section 251 provides the relevant backdrop . . . ." *Id.* at 850.

Having determined that Section 251 framed the analysis, the Court concluded that the proposed merger, in which the corporation "would simply disappear," rendered the certificate a "legal nullity" and "constitute[d] a repeal, if not an amendment or alteration." *Id.* at 851. In doing so, the Court rejected the defendants' argument that a stockholder vote would be required only if Avatex survived the merger and its certificate were amended thereby. The Court reasoned that the defendants' argument "fail[ed] to account for the word consolidation" in which the resulting corporation "is a completely new entity with a new certificate of incorporation." *Id.* (emphasis omitted). Therefore, the use of the word "consolidation" indicated that the drafters contemplated the right to a stockholder vote on transactions in which Avatex "would simply disappear." *Id.*

In the conclusion of its opinion, the Court went out of its way to provide clear guidance for practitioners:

21

> The path for future drafters to follow in articulating class vote provisions is clear. When a certificate (like the Warner certificate or the Series A provisions here) grants only the right to vote on an amendment, alteration or repeal, the preferred have no class vote in a merger. When a certificate (like the First Series Preferred certificate here) adds the terms "whether by merger, consolidation or otherwise" and a merger results in an amendment, alteration or repeal that causes an adverse effect on the preferred, there would be a class vote.

*Id.* at 855.

In *Starkman v. United Parcel Service of America, Inc.*, this court applied the reasoning of *Warner* and *Avatex* to a certificate provision that was not limited to preferred stock rights. C.A. No. 17747 (Del. Ch. Oct. 18, 1999) (TRANSCRIPT). In that case, the plaintiff was a stockholder of "Old UPS." In the proposed transaction, Old UPS merged into its second-tier subsidiary, and Old UPS's stockholders' shares were exchanged for shares of Old UPS's pre-transaction first-tier subsidiary ("New UPS"). *Id.* at 7:15–16, 8:3–10. After the transaction, New UPS was the top-level parent in the corporate structure. *Id.* at 7:16–18. There was no economic substance to the restructuring, but New UPS's certificate was different from Old UPS's certificate. As the court explained, "[t]he net effect of this, in one way of looking at it, is that the company is getting a new charter." *Id.* at 9:17–19. The stockholder plaintiff contended that the transaction triggered Article Fifth of the Old UPS certificate, which imposed a supermajority vote of all outstanding stock, voting together, for "any amendments to or deletion of" that provision. *Id.* at 16:8–15 (internal quotation marks omitted). The court disagreed. *Id.* at 15:17–23. First,

22

based on the provision's construction, the court concluded that the supermajority vote did not apply because the proposed transaction, which flipped the corporation's ownership structure, technically left the Old UPS certificate untouched, neither amending nor deleting the protected provision. *Id.* at 18:1–12. Second, the court explained that it "read *Avatex* and *Warner* [] as controlling the outcome here and requiring a finding that paragraph (9)'s supermajority voting requirement would not apply even if the charter of the surviving corporation in the merger amended or deleted the right of first refusal found in Article Fifth." *Id.* at 19:14–21. The *Starkman* court juxtaposed the two cases, highlighting that "the Supreme Court in *Avatex* rested its holding on the presence of language in the Avatex certificate of incorporation specifically referring to the possibility of an amendment, alteration or repeal by merger, consolidation or otherwise," whereas that "critical language, referring to merger, consolidation or otherwise, was not found in *Warner* and is not found here." *Id.* at 19:21–20:5. Therefore, under *Warner* and *Avatex*, the merger was subject only to majority stockholder approval under Section 251.

Three years later in *Benchmark Capital Partners IV, L.P. v. Vague*, 2002 WL 1732423 (Del. Ch. July 15, 2002), *aff'd sub nom. Benchmark Capital Partners IV, L.P. v. Juniper Financial Corp.*, 822 A.2d 396 (Del. 2003) (TABLE), this court followed and arguably expanded upon the *Warner* line of cases. In *Benchmark*, a holder of preferred stock raised protections under several provisions in the certificate

to challenge a restructuring transaction harmful to its interests. The court first rejected the plaintiff's argument under a provision with language substantially similar to Section 242(b), in a direct application of the *Warner* court's reasoning with respect to similar language, explaining that "[w]here the drafters have tracked [Section 242's language], courts have been reluctant to expand those restrictions to encompass the separate process of merger." *Benchmark*, 2002 WL 1732423, at *7.

With respect to the second provision, the court acknowledged that it "does not track or even resemble" Section 242. *Id*. at *9. But the court concluded that, even in the absence of obvious similarities between the certificate's language and the statute, "the words chosen by the drafters must be read 'against the background of Delaware precedent,'" which required clear language authorizing a class vote. *Id*. at *10 (quoting *Avatex*, 715 A.2d at 852). "*Warner* and the cases following it, and *Starkman* in particular, demonstrate that certain rights of the holders of preferred stock that are secured by the corporate charter are at risk when a merger leads to changes in the corporation's capital structure." *Id*. at *10 (footnote omitted). The court emphasized the presence of prior guidance to corporate drafters, reiterating that:

> To protect against the potential negative effects of a merger, those who draft protective provisions have been instructed to make clear that those protective provisions specifically and directly limit the mischief that can otherwise be accomplished through a merger under 8 *Del. C.* § 251. . . . General language alone granting preferred stockholders a class vote on certain changes to the corporate charter (such as

24

authorization of a senior series of stock) will not be read to require a
class vote on a merger and its integral and accompanying modifications
to the corporate charter and the corporation's capital structure.

*Id.* (footnote omitted). In so ruling, the court explained that it was "reluctant both to presume that protection from a merger was intended and, perhaps more importantly, to create uncertainty in a complex area where *Avatex* has set down a framework for consistency." *Id.* at *10.[28]

Over the last 20 years since *Benchmark*, this court has continued to adhere to *Warner*'s application of the doctrine of independent legal significance and refused to extend certificate-based voting requirements to mergers and consolidations absent clear language in accordance with *Avatex*. *See, e.g.*, *Greenmont Cap. P'rs I, LP v. Mary's Gone Crackers, Inc.*, 2012 WL 4479999, at *5 (Del. Ch. Sept. 28, 2012) (noting that "the drafters appear to have attempted to take advantage of the safe harbor offered by *Avatex*" "by including the words 'whether by merger, consolidation, or otherwise'" in a protection against "'action that alters or changes'" rights, but concluding that the challenged conversion merely "effectuate[d] an existing right" and, therefore, was not an alteration or change); *SBTS, LLC v. NRC Gp. Hldgs. Corp.*, C.A. No. 2019-0566-JTL, at 33:13–18 (Del. Ch. Sept. 11, 2019)

---

[28] The *Benchmark* plaintiff's third contention concerned a restriction on the corporation's ability to issue senior equity, the interpretation of which did not implicate the "'background' precedent" of *Warner* and its progeny pertinent to this case. *Benchmark*, 2002 WL 1732423, at *11.

(TRANSCRIPT) (endorsing the proposition that, under *Avatex*, the phrase "by merger, consolidation or otherwise" in a certificate provision extends special voting rights to actions taken under Section 251 and observing that "while technical and formal" this approach was "consistent with how these principles evolved under Delaware law").[29] Defendants argue that *Warner* and its progeny apply and are controlling here. The court agrees.

### 2. Plaintiff's arguments do not compel a Supermajority vote requirement for the Conversion.

Plaintiff's core arguments to the contrary are that the plain language of Article X requires a Supermajority vote to approve the Conversion and that the court should look to the Conversion's substance, not its form. He further contends that Article X is not limited to amendments under Section 242 of the DGCL and that the *Warner* and *Avatex* line of cases are inapplicable because of formal differences between mergers and conversions. He also argues that any ambiguity should be construed in favor of the common stockholders.

---

[29] The court ultimately concluded that the challenged transaction, as structured, did not amend, alter, or repeal protected provisions of the certificate. In order to provide the parties with time to take an expedited appeal, the court indicated that it was adopting the arguments made by the main defendants. *See SBTS*, C.A. No. 2019-0566-JTL, 33:5–7, 34:11–13 (TRANSCRIPT). The operative language of the certificate and substantive arguments from the case are taken from the *SBTS* defendants' briefs. *See SBTS, LLC v. NRC Gp. Hldgs. Corp.*, C.A. No. 2019-0566-JTL (Del. Ch.), Dkts. 19, 34.

### a.     *Warner* **is not limited to preferred stock preferences.**

Plaintiff argues that *Warner*, *Avatex*, and *Benchmark* are inapplicable here because they involved the voting rights of preferred stock, which are said to be strictly construed.[30] *See Holland v. Nat'l Auto. Fibres*, 194 A. 124, 126 (Del. Ch. 1937) (observing that the preferences of preferred stock "ought to be clearly expressed, if not by words of explicit import, at least by necessary implication"). But that interpretive lens posed no impediment in *Starkman*, which was not limited to the rights of preferred stock.[31]   Furthermore, it is well established that, like the preferences of preferred stock, "high vote requirements" "must be clear and unambiguous," leaving "no doubt that the shareholders intended that a supermajority would be required." *Centaur*, 582 A.2d at 927.  Thus, this argument is unavailing.

---

[30] Pl.'s Opening Br. 2–3, 22, 32–34.

[31] Nor was it an impediment in *In re P3 Health Group Holdings, LLC*, which applied *Warner* and *Avatex* to conclude that the plaintiff's consent right to any change in the limited liability company's board of managers did not grant a separate vote on a merger.  2022 WL 16548567, at *13 (Del. Ch. Oct. 31, 2022) ("Delaware decisions have made clear that if a party wants a consent right that applies to mergers generally, or which applies to mergers that have the effect of altering, amending, or eliminating a special right that the party possesses, then the consent right must refer specifically to a merger."  (citing *Avatex*, 715 A.2d at 854–55)).  Plaintiff acknowledges that cases in the alternative entity context can be persuasive.  *See* Pl.'s Reply & Answering Br. 20 & n.63.

### b. Plaintiff's plain language arguments do not displace the weight of the case law.

Plaintiff is correct that when construing contracts "'Delaware courts start with the text. And if the text is unambiguous, Delaware courts end there too.'"[32] But Plaintiff's argument construes the relevant "text" too narrowly. Individual words "must be read together with" accompanying language, as well as "the other DGCL sections addressing" the same subject. *Fox/Snap*, 312 A.3d at 647; *see Activision Blizzard, Inc. v. Hayes*, 106 A.3d 1029, 1033–34 (Del. 2013) (rejecting a result that "fits the dictionary definition" of a phrase in the certificate and explaining that "the provision must be read in context"). When applying contract interpretation principles, "Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021). When it comes to the construction and interpretation of a certificate of incorporation, "the agreement as a whole" includes the DGCL and all of its amendments, which the Delaware legislature has determined "shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation." 8 *Del. C.* § 394; *see also Benchmark*, 2002 WL 1732423, at *9

---

[32] Pl.'s Opening Br. 20 (quoting *SeaWorld Ent., Inc. v. Andrews*, 2023 WL 3563047, at *3 (Del. Ch. May 19, 2023) (footnotes and internal quotation marks omitted), *aff'd*, 314 A.3d 662 (Del. 2024) (TABLE)).

28

(observing that "drafters of [corporate governance documents] are charged with knowledge" of decisional case law with respect to specific language and its effects under our law). Therefore, when looking to the "text," the court looks not only to the single phrase upon which Plaintiff focuses, but also to the rest of Article X, the rest of the Certificate, the DGCL, the decisional case law, and the interpretative principles that apply at each level.

Certificate amendments are the subject of Section 242 of the DGCL. *Fox/Snap*, 312 A.3d at 645; *Warner*, 583 A.2d at 969. "Section 242(a) authorizes charter amendments and Section 242(b)(1) requires that stockholders approve charter amendments by the affirmative vote of a majority of the outstanding stock entitled to vote on the amendment." *Fox/Snap*, 312 A.3d at 645.

It is apparent from the plain language of Article X, read as a whole, that it pertains to certificate amendments.[33] The first half of Article X advises that the

---

[33] Plaintiff's argument that the Supreme Court's decision in *Stream TV* dictates a different analysis and different result is misplaced. In *Stream TV*, the Court held that Section 271 of the DGCL, which applies to a "sale, lease or exchange" of all or substantially all assets could not serve as an interpretive guide to a certificate provision that afforded a class vote in the event of an "Asset Transfer." *Stream TV*, 279 A.3d at 338–39. The certificate defined Asset Transfer as "a sale, lease *or other disposition* of all or substantially all of the assets or intellectual property" of the corporation. *Id.* at 338 (emphasis added) (internal quotation marks omitted). The Court concluded that this language was "broader" and "materially different" from the language in Section 271. *Id.* at 337–39. *Stream TV* is wholly consistent with *Avatex*, where the certificate language was materially different from *Warner* and, therefore, extended a vote to mergers and consolidations effected under Section 251. Unlike in *Stream TV* and *Avatex*, Plaintiff here does not point to language in

29

corporation could seek to "amend, alter, change or repeal any provision contained in this Restated Certificate," explains that "other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by statute," and cautions that "all rights, preferences and privileges of any nature conferred upon stockholders, directors or any other persons herein are granted subject to this reservation." The first and third clause each expressly identifies their object as the Certificate ("amend [etc.] this Restated Certificate"; "all rights, preferences and privileges . . . conferred . . . *herein*" (emphasis added)). It naturally follows that the provision between them refers to the same object ("other provisions [of this Restated Certificate] . . . may be added or inserted").

This reading is also consistent with the case law construing similar provisions. For example, the reference to "rights, preferences and privileges" is identical to that which this court found in *Benchmark* to be "substantially the same" as language in Section 242. 2002 WL 1732423, at *7. And the language discussing action to "amend, alter, change or repeal any provision contained in this Restated Certificate"

---

Article X that is "materially different" from Section 242. Instead, Plaintiff simply contends that "the language of Article X bears no resemblance to the language of Section 242(b)(2)." Pl.'s Opening Br. 29. But a direct resemblance is not necessary to conclude that Article X applies to certificate amendments, and there are no stark deviations in Article X from language with an established meaning, akin to the dispositive drafting choices in *Stream TV* and *Avatex*.

30

is substantially similar to the language the *Warner* court found referred to certificate amendments under Section 242: "amend, alter or repeal any of the provisions of the Certificate of Incorporation." 583 A.2d at 965 (internal quotation marks omitted). Thus, the first half of Article X relates only to certificate amendments under Section 242.

Plaintiff's focus on the single phrase "amend or repeal, or adopt" in the second half of Article X does not expand its scope beyond Section 242.[34] Short phrases, of

---

[34] The conditional proviso at the beginning of the second half of Article X does not change the analysis. The *Starkman* court considered and rejected an argument that prefatory language similar to that in Article X required a more expansive interpretation of Old UPS's Article Fifth, explaining that "[i]t is unreasonable and unfair to read this prefatory language to expand the scope of [Article Fifth's] supermajority vote requirement beyond amendments to the certificate of incorporation or to preclude the authorization of other transactions authorized by sections other than Section 242 of the statute" because this "introductory language, in my opinion, has a [] modest purpose," serving "merely to clarify the interplay between potentially inconsistent provisions of the charter" and the voting requirements under Section 242. C.A. No. 17747, at 21:8–12, 22:6–12 (TRANSCRIPT); *compare id.* at 20:19–21 ("'notwithstanding anything contained in this Certificate of Incorporation to the contrary'"), *with* Certificate Art. X ("notwithstanding any other provision of this Restated Certificate or any provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of this Corporation required by law or by this Restated Certificate"). Although Article X's reference to "any provision of law that might otherwise permit a lesser vote or no vote" is phrasing not found in the certificate in *Starkman*, it does not, as Plaintiff argues, "displace[] the DGCL with respect to the stockholder vote here." Pl.'s Reply & Answering Br. 30. "A proviso, as introduced here by the word 'provided,' acts as a limitation on the language that describes the scope of the provision and is read in reference to the specific scope of the language defining the provision's application." *In re Explorer Pipeline Co.*, 781 A.2d 705, 719 (Del. Ch. 2001); *accord ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *8 (Del. Ch. Nov. 30, 2017) ("The second [phrase] is a proviso, *i.e.*, 'a clause that introduces a condition by the word *provided*.' A proviso 'conditions the principal matter that it qualifies,' which is 'almost always the matter immediately

31

course, can have material effects on the meaning of a contract. Indeed, one was determinative in *Avatex.* 715 A.2d at 854 ("[T]he language of the [*Avatex* certificate] is materially different from the language in *Warner* because here we have the phrase, 'whether by merger, consolidation or otherwise.' This provision entirely changes the analysis and compels the result we hold today.").[35] But each phrase must be read in the full context of the Certificate, statute, and governing case law, and the case law makes clear that express language referencing specific corporate acts is necessary to achieve the effect Plaintiff seeks. *Compare FLS*, 1992 WL 345453, at *3 (finding that a class vote provision only applied to Section 242 amendments because "neither the phrase 'by amendment . . . or otherwise' nor Section B.1(H)(iii) mentions mergers at all" (alteration in original)), *with Avatex*, 715 A.2d at 854 & n.49 (identifying that the Court "need not wrestle with the words 'or otherwise' as the Court of Chancery did in" *FLS* "[b]ecause the word *consolidation* is included").

---

preceding.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 154 (2012))). Nothing in Article X's proviso takes its subject matter outside of actions under Section 242.

[35] Plaintiff contends that "*Centaur* stands for the proposition that the use of the phrase 'amend or repeal, or adopt any provision inconsistent with' constitutes a clear expression of an intent to impose a broad supermajority-approval requirement not subject to evasion by creative transaction planners." Pl.'s Opening Br. 31. Not so. While that language appeared in the certificate and bylaws at issue in *Centaur*, it was not at issue. Instead, the Court's analysis focused on the interpretation of the phrase "or any similar provision." The mere presence of this phrase in the background of an opinion deciding a different issue is not persuasive.

32

Read in context, the phrase "amend or repeal, or adopt" tracks the language in the first half of Article X and must be limited to actions taken under Section 242. The restrictions to "amend or repeal" track the first clause ("amend, alter, change or repeal") and the restriction to "adopt any provision" tracks the second clause ("other provisions . . . may be added or inserted"). The phrasing varies between the first and second half of Article X, but the language in the second half of Article X offers no indication of intent to expand the proviso beyond the language it purports to limit. Moreover, the clause identifying the restricted actions affirms twice that such actions are only with respect to "this Restated Certificate."

Altogether, all clear references to what Article X concerns point to certificate amendments under Section 242, and the rest of Article X neatly fits under that section without providing any indication that corporate action taken under other sections of the DGCL would be implicated. *See FLS*, 1992 WL 345453, at *5 ("The drafters' failure to express with clarity an intent to confer class voting rights in the event of a merger suggests that they had no intention of doing so . . . ."); *Benchmark*, 2002 WL 1732423, at *10 ("General language alone granting preferred stockholders a class vote on certain changes to the corporate charter (such as authorization of a senior series of stock) will not be read to require a class vote on a merger and its integral and accompanying modifications to the corporate charter and the corporation's capital structure."). "'Thus, *Warner*, which was reaffirmed by the

33

Supreme Court, requires that I read [the supermajority provision] to pertain only to charter amendments proposed in accordance with section 242 of the Delaware General Corporation Law.'" *Benchmark,* 2002 WL 1732423, at *8 (alteration in original) (quoting *Starkman*, C.A. No. 17747, at 20:5–9 (TRANSCRIPT)).

Further confirming this reading is the drafters' inclusion of special voting rights elsewhere in the Certificate. Article IV(C)(2)(c) provides, in pertinent part:

> Any merger or consolidation of the Corporation with or into any other entity, or any other transaction having an effect on stockholders substantially similar to that resulting from a consolidation or merger, in each case which is not a Change of Control Transaction, shall require approval by the affirmative vote of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock, each voting separately as a class, unless (i) the shares of Class A Common Stock and Class B Common Stock remain outstanding and no other consideration is received in respect thereof or (ii) such shares are converted on a pro rata basis into shares of the surviving or parent entity in such transaction having substantially identical rights to the shares of Class A Common Stock and Class B Common Stock, respectively.[36]

Article IV(C)(2)(c)'s clear and explicit expression of special voting rights in the event of a "merger or consolidation . . . or any other transaction" having a certain "effect on stockholders" stands in stark contrast to Article X, which contains no such expression. *See FLS*, 1992 WL 345453, at *5 (refusing to construe a certificate provision as affording a class vote on a merger where it did not expressly so provide, noting that the drafters explicitly did so elsewhere in the certificate). Had the drafters

---

[36] Certificate Art. IV(C)(2)(c).

of Article X intended to expand its scope beyond actions taken under Section 242 of the DGCL, "they knew fully well how to do so." *Id.* at *5; *see also Warner*, 583 A.2d at 970 (opining that the drafters' having expressly addressed the possibility of a class vote on a merger elsewhere in the certificate suggested that a different special vote provision which did not expressly mention mergers was inapplicable).

It is apparent from the case law that corporate drafters are well aware of and have employed the *Avatex* language when they want to extend special voting rights beyond Section 242. *See, e.g., Mary's Gone Crackers*, 2012 WL 4479999, at *5 (employing the exact language from *Avatex*); *SBTS*, C.A. No. 2019-0566-JTL (TRANSCRIPT) (same). "The drafters [of Article X] could have simply tracked the language [of *Avatex*], but did not." *Stream TV*, 279 A.3d at 339 (internal quotation marks omitted). The clear language and structure of Article X indicate that it applies only to certificate amendments under Section 242, and the absence of language akin to that in *Avatex* in Article X indicates that it was not intended to have broader effect.

### c.     Plaintiff's appeal to substance over form is unavailing.

Essentially ignoring the doctrine of independent legal significance, Plaintiff contends that Delaware law requires the court to consider substance over form.[37] This argument lacks persuasive force under the circumstances of this case.

---

[37] Pl.'s Reply & Answering Br. 19–20.  Plaintiff relies heavily on *Twin Bridges Ltd. Partnership v. Draper*, 2007 WL 2744609 (Del. Ch. Sept. 14, 2007), as authority for requiring a Supermajority vote.  The circumstances of that case do not resemble the situation here.  *Twin Bridges* involved a limited partnership and claims arising out of the adoption of a new limited partnership agreement and related merger.  The operative limited partnership agreement required a unanimous vote of the members for certain actions.  This court, applying the step-transaction doctrine utilized in tax law, held that the amendment and merger constituted a single transaction.  Relying on *Avatex*, the court deemed the adoption of the new limited partnership agreement to be an amendment of the old agreement, potentially implicating the unanimous vote requirement.  Ultimately, however, the court concluded that the amendment and merger were not events that required a unanimous vote, either together or independently.  Thus, the opinion's assessment that the extinguishment of the old operating agreement in exchange for a new one constituted an amendment under the operating agreement is *dicta*.  Furthermore, the court determined that the pertinent section of the limited partnership agreement did not parallel the terms of the limited partnership act.  When viewed in light of the *Warner/Avatex* line of cases, *Twin Bridges* is limited to its facts and is not persuasive here.  For example, this court declined to consider the doctrine of independent legal significance to interpret the limited partnership agreement and did not find a statutory parallel to the partnership agreement that would go to the unanimous vote requirement.  *Twin Bridges*, 2007 WL 2744609, at *10 n.47 (explaining that "my resolution of the substantive issues in this case does not turn on" the doctrine of independent legal significance).  *Activision* is equally unavailing.  *Activision* did not discuss or even cite to *Warner* or *Avatex*.  Unconcerned with the form of the challenged transaction, the Court ruled on the grounds that the phrase "merger, business combination, or similar transaction" did not cover the corporation's acquisition of a holding company that controlled 38% of the corporation's outstanding stock, concluding that the "inert" holding company was not a "business."  *Activision*, 106 A.3d at 1031, 1034.  Plaintiff also cited *Pasternak v. Glazer*, 1996 WL 549960 (Del. Ch. Sept. 24, 1996), in his briefing for the proposition that the court should not interpret Article X to create a "glaring loophole," but did not press its applicability at oral argument—presumably recognizing, as Defendants pointed out in their final brief, that the Supreme Court vacated the trial court's

The doctrine of independent legal significance is a bedrock of Delaware corporate law and should not easily be displaced. "An open-ended inquiry into substantively equivalent outcomes, devoid of attention to the formal means by which they are reached, is inconsistent with the manner in which Delaware law approaches issues of transactional validity and compliance with the applicable business entity statute and operative entity documents." *Kinder Morgan*, 2014 WL 5667334, at *9; *see Avatex*, 715 A.2d at 855 (explaining that it is important to provide "results [that] are uniform, predictable and consistent with existing law"). As this court has observed, "the entire field of corporation law has largely to do with formality. Corporations come into existence and are accorded their characteristics, including most importantly limited liability, because of formal acts. Formality has significant utility for business planners and investors." *Uni-Marts, Inc. v. Stein*, 1996 WL 466961, at *9 (Del. Ch. Aug. 12, 1996) ("[W]hen construing the reach and meaning of provisions of the Delaware General Corporation Law, our law is formal."); *accord Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) ("Thus, Delaware courts, when called upon to construe the technical and carefully drafted provisions of our

opinion on appeal. *See Glazer v. Pasternak*, 693 A.2d 319 (Del. 1997) (vacating the trial court's opinion because the appeal had become moot). "A vacated decision has no force and effect," and requires no further analysis. *Pauley ex rel Pauley v. Reinoehl*, 848 A.2d 561, 566 (Del. 2003), *opinion partially vacated on reargument*, 848 A.2d 569 (Del. 2004); *see Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *10 (Del. Ch. Nov. 7, 2013) ("Ironically, the *Pauley* opinion was itself partially vacated on reargument, but not with respect to its holding on vacatur.").

statutory corporation law, do so with a sensitivity to the importance of the predictability of that law.").

The court's goal here is to give effect to the drafters' decisions in selecting which words to use—and which words to not use. Where decades of case law provides express guidance to corporate drafters and emphasizes that our courts charge drafters with knowledge of that case law, giving effect to the drafters' decisions entails adhering to that guidance at the judicial level as well.

The central principles under *Warner* and *Avatex* have "evolved under Delaware law" in a "technical and formal" manner. *SBTS*, C.A. No. 2019-0566-JTL, at 33:16–18 (TRANSCRIPT). Wholesale abandonment of formality in a clearly defined area of law would frustrate drafters' intent and undermine the utility and predictability offered thereby.

This is not to say that there is no place for an inquiry into the substance of a transaction in the interpretation of a certificate's language. As Plaintiff's authorities make clear, a substantive analysis may prove necessary to determine drafters' intent in adopting a particular provision. But here, exalting substance over form would be misguided. Just as a more substantive analysis may be necessary to ensure that the actual intent of the parties is given effect, so too does formality play a critical role in the interpretation of certificates and corporate law writ large. *Warner* and its progeny control here. These cases have drawn clear lines for corporate drafters to

follow when seeking to extend a protective supermajority certificate amendment provision to govern actions under DGCL sections other than Section 242. The drafters of Article X neither employed the specific language endorsed in *Avatex*, nor anything remotely similar. The court ascribes intent to that omission and declines Plaintiff's invitation to reject the governing case law and drafters' reliance thereon.

### d. Neither Plaintiff's pivot to formalism nor his invocation of the implied covenant change the outcome.

At oral argument, Plaintiff conceded that a Supermajority vote under Article X would not be required if Defendants had proposed effecting the reincorporation by way of a merger instead of under Section 266.[38] Plaintiff's concession essentially reflects the abandonment of his earlier argument that "Article X's Supermajority Approval requirement applies in a variety of circumstances" (*i.e.*, not only to amendments under Section 242) and that the "broad language [of Article X] indicates that [the Supermajority] requirement is intended to apply expansively to safeguard the rights of the Company's minority, public stockholders."[39] Rather, Plaintiff not only acknowledges that *Warner* and its progeny are applicable in

---

[38] Dkt. 32 at 19:3–24 ("I agree with that because *Avatex* says so expressly . . . . [I]f you want to capture that, you have to make sure that you are using the words 'by merger or otherwise.' So I just think because mergers work in different ways, you can have a merger that has no impact on the charter at all. Yes, *Avatex* covers that. So if they wanted to do this by merger, there would not be a charter-based objection to that.").

[39] Pl.'s Opening Br. 41.

construing Article X, but also that the application of that framework limits Article X to actions taken under Section 242.

Undaunted, Plaintiff pivots to formalism and argues that differences between mergers and conversions mandate different treatment under the Certificate, even though they would have the same end result. Plaintiff argues that Article X applies to conversions because a "repeal" of the Protected Provisions, one of the prohibited actions, can encompass actions rendering a certificate "a legal nullity"—the essential effect of a Section 266 conversion. *Avatex*, 715 A.2d at 851 (explaining that a merger whereby the non-surviving corporation "will cease its independent existence" and "its certificate becomes a legal nullity" "constitutes a repeal, if not an amendment or alteration"); *see* 8 *Del. C.* § 266(d) (explaining that "the corporation shall cease to exist as a corporation of this State" at the effective time, without any involvement regarding such former corporation's technically unaltered certificate). Plaintiff contends that because the effect of a conversion is, broadly speaking, a "repeal," the mere use of the word "repeal," without more, mandates that Article X applies to a conversion under Section 266. The issue for Plaintiff, however, is that the mere potential for a "repeal" as a result of a conversion does not mean that Article X applies to conversions under *Warner* and its progeny. As the *Avatex* Court made clear, the "outcome-determinative" distinction between that case and *Warner* lay not in the words "amendment, alteration or repeal"—the material

difference was "the phrase, 'whether by merger, consolidation or otherwise.'" *Avatex*, 715 A.2d at 854–55. The material distinction that led to the result in *Avatex* is absent here. As Plaintiff admits, "this same rule [*i.e.*, the *Warner* line of cases] applies outside the merger context. No one disputes that the logic can extend beyond mergers."[40]

Plaintiff's argument is, therefore, reduced to an invocation of the implied covenant of good faith and fair dealing. Plaintiff's implied covenant argument has been addressed statutorily. Clearly mindful of the risk of the statutory amendment to the unanimity requirement circumventing *Avatex* provisions, the legislature added Section 266(k) to the statute in conjunction with lowering the voting requirements. Given that the statute mandates the application of pre-amendment language restricting mergers and consolidations to conversions as well, there is no principled reason to imply a restriction on conversions that does not apply to mergers or consolidations.

Therefore, it is apparent from the doctrinal substance of *Warner* and its progeny, the history of Section 266, and the text of Section 266(k) that the *Warner*

---

[40] Pl.'s Reply & Answering Br. 27 (alteration in original) (footnote and internal quotation marks omitted); *see, e.g., Mary's Gone Crackers*, 2012 WL 4479999, at *8 ("Just as the Court concluded that the stock conversion and subsequent certificate amendment in *Warner* were separate events, I consider the conversion and the Charter amendment here to have been separate and independent occurrences.").

doctrine should be applied with equal force to conversions and that Article X does not impliedly cover actions under Section 266.

> **e.** **There is no ambiguity, so the doctrine of *contra proferentem* is inapplicable.**

Finally, Plaintiff contends that the court should consider the application of the doctrine of *contra proferentem* and resolve any ambiguity in Article X in favor of Plaintiff and impose a Supermajority vote requirement for the Conversion. *See Shiftan v. Morgan Joseph Hldgs., Inc.*, 57 A.3d 928, 935–36 (Del. Ch. 2012) ("Our Supreme Court has frequently invoked this doctrine of *contra proferentem* to resolve ambiguities about the rights of investors in the governing instruments of business entities."). The presence of ambiguity is, however, a necessary prerequisite for the doctrine's application, and the Court has made clear that it "appl[ies] the *contra proferentem* principle [] only as a last resort [where] the language of the certificate presents a hopeless ambiguity, particularly when alternative formulations indicate that these provisions could easily have been made clear." *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 399 (Del. 1996). That is not the case here, and the doctrine of *contra proferentem* is inapplicable. *See Avatex*, 715 A.2d at 853 (concluding that *contra proferentem* "is not applicable here because there is no ambiguity").

\*          \*          \*

In sum, based on *Warner*, *Avatex*, and their progeny, the court concludes that corporate drafters seeking to exalt substance over form, or otherwise displace the doctrine of independent legal significance and expand certificate language across sections of the DGCL, must do so with clear, express language. Such language is not employed in Article X, so its scope falls only within the form it clearly references: certificate amendments under Section 242. This is just as true with respect to conversions under Section 266 as it is with respect to mergers and consolidations, particularly in light of Section 266(k). The Conversion is to be effected under Section 266, not Section 242, so Article X is inapplicable. Plaintiff does not contend that any other language in the Certificate imposes a different standard. Therefore, Section 266's default majority vote applies.

Accordingly, Plaintiff's motion for summary judgment on Counts I and II must be denied, and Defendants' motion for summary judgment on Counts I and II must be granted.

## D. Entry of Partial Final Judgment Under Rule 54(b) with Respect to Counts I and II is Warranted

Both sides have requested that the court enter a partial final judgment pursuant to Court of Chancery Rule 54(b) so as to allow for an immediate appeal on Counts I and II. Rule 54(b) provides, in pertinent part:

> When more than 1 claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, the Court may direct the entry of a final judgment upon 1 or more but fewer than all

43

of the claims or parties only upon an express determination that there is not just reason for delay and upon an express direction for the entry of judgment.

"Rule 54(b) is an exception to the well-established policy against piecemeal appeals, and does not contemplate the entry of final judgment absent a showing of some degree of hardship or injustice through delay which would be alleviated by immediate appeal." *Zimmerman v. Home Shopping Network, Inc.*, 1990 WL 140890, at *1 (Del. Ch. Sept. 25, 1990) (internal quotation marks omitted). This court's authority under Rule 54(b) has been characterized as a "discretionary power to afford a remedy in the infrequent harsh case." *In re Tri-Star Pictures, Inc., Litig.*, 1989 WL 112740, at *1 (Del. Ch. Sept. 26, 1989) (internal quotation marks omitted).

All of the elements of Rule 54(b) are satisfied in this case, and entry of a partial final judgment is warranted. This action involves multiple claims, not all of which are resolved in this ruling: in addition to the two claims adjudicated on the Cross-Motions, the Amended Complaint asserts two further claims alleging that the Director Defendants breached their fiduciary duties in approving the Conversion. The court has, on the present Cross-Motions, adjudicated and finally decided the claims alleging that the Conversion requires Supermajority approval and that the Proxy discloses the incorrect voting requirement for the Conversion. There is no just reason for delaying an appeal as to whether the Conversion is subject to Article X. The question presented on the Cross-Motions and resolved in this opinion is one

44

purely of law, upon which no further factual development would have an effect, and its resolution in advance of the November 14, 2024 Special Meeting is critical. This is the same procedural vehicle by which this court's decisions in *Avatex* and *FLS* advanced to the Supreme Court. *See Avatex*, 715 A.2d at 845 n.4 (noting that this court certified its ruling as a final judgment under Rule 54(b)); *FLS*, 1992 WL 345453, at *8 (directing entry of final judgment for defendants on the class-vote claim pursuant to Rule 54(b)). Therefore, the court will enter a partial final judgment with respect to Counts I and II.

## III.    CONCLUSION

In conclusion, Article X does not apply to the Conversion and Defendants have correctly disclosed that only a majority vote is necessary. Accordingly, Plaintiff's motion for summary judgment on Counts I and II is denied, and Defendants' motion for summary judgment on Counts I and II is granted.

Pursuant to Rule 54(b), the court expressly finds that there is no just reason for delay and directs the entry of partial final judgment for the Defendants with respect to Counts I and II. The court, having finally decided Counts I and II, denies Plaintiff's outstanding motion for a preliminary injunction as moot.